308 Ga. 638
FINAL COPY

S20A0285.  HILL v. THE STATE.

MELTON, Chief Justice.

Following a jury trial, Esco Hill appeals his conviction for malice murder.[1]  Hill argues, inter alia, that the trial court committed reversible error by requiring him to be visibly shackled for the duration of his six-day trial.  We agree and, consequently, we reverse.

Viewed in the light most favorable to the verdict, the evidence presented at trial shows that, on August 20, 2011, a large group of

[1] On October 6, 2014, a Chattooga County grand jury indicted Hill for malice murder, felony murder predicated on aggravated assault, and aggravated assault in connection with the stabbing death of Alford Morris. Hill's jury trial, where he proceeded pro se with the help of two stand-by counsel, was held from January 5-12, 2016.  The trial began as a joint trial with co-defendant Hjalmar Rodriquez, but Rodriquez pled guilty in the middle of the proceeding.  The jury eventually convicted Hill of malice murder and acquitted him of the remaining charges.  The trial court sentenced Hill to life in prison.  Hill filed a motion for new trial on January 13, 2016, which he subsequently amended through new counsel on November 20, 2018.  After a hearing, the trial court denied the motion as amended on August 7, 2019.  Hill filed a timely notice of appeal; his case was docketed to the term of this Court beginning in December 2019, and oral argument was held on February 12, 2020.

inmates at Hays State Prison launched a retaliatory attack on fellow inmate Alford Morris, which led to his death. Inmate Michael Lucas testified that Morris had a reputation for attacking Muslim inmates and stealing their possessions. On one occasion described by Lucas, Morris assaulted Hjalmar Rodriquez, a Muslim inmate, and stole his phone. After this attack, Rodriquez went to Hill, whom most of the Muslim inmates identified as a leader of the prison's Muslim community. Hill asked Morris to return Rodriquez's phone. Morris replied, "F**k, y'all, I don't give a damn about y'all, what y'all got to do you got to do. I don't like y'all Muslims no way." Thereafter, according to Lucas, Hill determined that something had to be done about Morris and developed a plan with Rodriquez and other inmates to attack Morris when he went to the medical unit for his morning insulin shot.

Testimony from other witnesses showed that, in preparation for the attack, several gates were tied closed with plastic bags so that Morris would be forced to take a specific path to the chow hall. Around 4:30 a.m. on August 20, 2011, officers escorted a large group

of inmates who were participating in Ramadan to the chow hall. Around the same time, Morris was escorted to the medical unit. While Morris was waiting to receive his insulin shot, Rodriquez and another inmate entered the medical unit. Meanwhile, Lucas ran to Hill, who was standing in the doorway of the chow hall, and yelled "it's happening."

As Lucas and Hill ran back toward the medical unit, Rodriquez and the other inmate approached Morris, each wielding a shank. Morris threw a chair at the armed men and fled the medical unit, running toward the chow hall. A correctional officer saw Hill trip Morris as the two men crossed paths. After stumbling back to his feet, Morris reached the gate leading to the chow hall and ran behind a correctional officer. At first, the officer blocked Morris's pursuers, but he stepped aside after one of the inmates took out a shank and threatened him. Thereafter, a crowd of inmates poured out of the chow hall doors and surrounded Morris in the yard, yelling "Allahu Akbar" as they kicked and stabbed him. When additional correctional officers arrived at the scene, the rowdy inmates

dispersed, throwing their weapons away as they returned to the chow hall. Morris got up on all fours and told one of the responding officers that he could not breathe. The officers had Morris lie back down on the ground; they called EMS, but Morris eventually died from his stab wounds.

Once officers regained control of the scene, they entered the chow hall and began inspecting and detaining inmates whose clothing showed blood spatter, grass stains, or dampness from the dewy grass where the stabbing had taken place. Lucas was one of the first inmates to be detained. He struggled when officers attempted to handcuff him and, just before officers deployed their pepper spray, Hill intervened and told Lucas to cooperate with the officers. Hill continued to intervene in the officers' search of other inmates, offering explanations as to why certain inmates had stains on their clothes or cuts to their skin, all the while encouraging his fellow inmates to cooperate with the officers' efforts.

Officers became suspicious of Hill's behavior because he seemed to be "running the show." They detained Hill and escorted

him, along with the other inmates detained as a result of the search, to the Security Management Unit where they were placed in lockdown for additional investigation. At this time, Hill's clothes were taken as evidence and turned over to the GBI for testing. DNA testing revealed the presence of Morris's blood on Hill's pants.

1. Although Hill does not challenge the sufficiency of the evidence supporting his conviction, as is our practice in murder cases, we have reviewed the record and conclude that the evidence presented at trial was sufficient for the jury to find Hill guilty beyond a reasonable doubt of the murder for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Hill contends that the trial court abused its discretion when it required him to be visibly shackled in front of the jury with handcuffs, a waist chain, and leg irons and that this error prejudiced his right to a fair trial. The State argues that the trial court did not err, but to the extent that it did, any error was harmless. Based on the record before us, we conclude that the trial court committed

reversible error.

The record shows that, immediately prior to the start of trial, Hill and his co-defendant Rodriquez announced their desire to represent themselves. Thereafter, the trial court engaged in a lengthy discussion with the men concerning their right to represent themselves and the trial court's decision that the men would be visibly shackled throughout their trial. At the beginning of the discussion, the trial court stated, in pertinent part:

> There are also security issues. Of course obviously y'all are in handcuffs and leg irons. We're having you dressed in street clothes. We're trying to keep the jury from being prejudiced about knowing that y'all are under a great deal of security, but as a factual matter you have to have a great deal of security. The more you move around the courtroom the more obvious your restraints are going to be. Your lawyers would know how to address that. If they're representing you they would be the one standing and asking the questions, not you, so none of the jurors would see your handcuffs. They can do things you can't do.

When Hill commented on the prejudicial effect of appearing before the jury in handcuffs, a waist chain, and leg irons, the trial court responded, "[W]e had made a determination not to have you in

handcuffs for the trial, but . . . based on your behavior this morning we've changed our mind about that based upon security issues." Hill urged the trial court to reconsider, offering that his last prison fight had been seventeen years ago and his last disciplinary report six years ago. To which the trial court replied, "[W]e have established a security plan for this trial, Mr. Hill[,] . . . [s]o we're going to stick with that."

Later, while the trial court was informing Rodriquez of his right to proceed pro se, the State prompted the trial court to make Rodriquez aware of "the shackle issue," after which the court stated:

> Right. Now, also because y'all are both inmates in the penitentiary, I don't know where you're housed now, and you're charged with murder[,] there's a lot of security issues in this trial. At every hearing you have been in leg irons and you've been in handcuffs. And I anticipate that's what you're going to be in during the trial. We had set up a protective fabric railing so the jury would not see you in leg irons and have your lawyers sit at counsel table. So generally the lawyer sits at counsel table, if you want to represent yourself do you want to sit at counsel table where you have more room on the desk or do you want to sit [at the table with the protective fabric railing]?

When both defendants chose to sit at counsel's table, because those

tables were level and provided more room for their paperwork, the

following transpired:

> TRIAL COURT: [T]hat means it is your choice . . . that the jury sees the leg irons because they're not coming off during this trial.
> RODRIQUEZ:  Wouldn't that prejudice me against the jury?
> TRIAL COURT: They know — in this case they're going to know certain things. They will know that this all occurred at Hays Prison.
> RODRIQUEZ:  And —
> TRIAL COURT: Let me finish, please, sir, I'm not going to interrupt you and I don't want you to interrupt me. There are certain security issues that the Court and the Sheriff's Department and the Department of Corrections has to maintain and we've had lengthy hearings and meetings[2] about that and we've made those decisions, we're comfortable with them.  Okay.  Any other questions?
> RODRIQUEZ:  The leg irons and the shackles as security issues, can it be subverted to a shock device to where it could be hidden up under my clothes and the jury couldn't see that?
> TRIAL COURT:  We've had those meetings, Mr. Rodriquez, I had requested the lawyers to make requests or give me — the lawyers have been fully apprised of all that, those decisions have been made.  And we've already had problems with Mr. Hill this morning.  So we're not going to make any less restrictive requirements.

---

[2] No transcripts for these pre-trial hearings and meetings were transmitted to this Court, and the prosecutor conceded at oral argument that he failed to tender the security plan as an exhibit or request that the trial court make it a part of the record.

Before the prospective jurors were brought in, both Hill and Rodriquez renewed their objections to the visibility of their shackles and requested their removal. The prosecutor responded, "I know with Mr. Hill specifically this morning there were security issues where he made certain statements along the lines of everybody was going to remember Esco Hill after this morning." The prosecutor did not indicate that he personally heard any statement Hill made. Hill objected to this proffer as hearsay and denied ever making such a statement, but the trial court responded that it was not hearsay because it was Hill's own statement. The prosecutor continued:

> In addition, the incident which is on trial is of course a violent crime which occurred while these defendants were in custody. The security risks are extremely high. These defendants were made aware of this before they chose to represent themselves. They were given the option of sitting behind the bar. The Court went to great lengths to create an environment in which these shackles would not be visible. The only reason that the jurors will see them now is because of the results of their choices.

After hearing additional arguments from Hill and Rodriquez, the following transpired:

TRIAL COURT: I'm going to stay with the restraints we

have. We've had several hearings in this case, when you gentlemen were arraigned you were under a lot more physical constraints than you are now. The Court was going to allow you to remain without your hands under shackles but just feet shackles until we had problems with Mr. Hill and we have security issues. Security is a very serious issue here, this is a very old courthouse. We have marvelous human resources but very poor physical resources. So I rely upon my security decisions.

HILL: One more thing. Your Honor, can you state for the record what the security issues were with Hill that required restraints because —

TRIAL COURT: I said all I'm going to say about it, Mr. Hill.

The trial court then proceeded with jury selection and opening statements.

The following morning, before bringing the jurors in, the trial court made the following statement to stand-by counsel, outside of Hill's presence:

Department of Corrections officers told [the sheriff] this morning that they have not had incidents with either of these defendants overnight or this morning. It was the original Court's trial plan and security plan to allow the handcuffs to be off during the trial so they could write and pass notes to their lawyers, but Mr. Hill acted out, had to be I think tazed the night before yesterday or yesterday morning. He made statements, it's reported to the Court that he made statements, at the end of the day everybody in the world was going to know who he was. And at that

point the Court made the personal decision that they would have to have handcuffs on yesterday.

Now, we then — then they chose, we had set up the screen where the jury would not see their leg irons or their handcuffs and when they both decided to go pro se the Court gave them a choice whether to sit behind the screen where they obviously would have less of a table to work on or to sit at counsel table and alerted them to the fact that their security measures would be visible and they both chose to sit at counsel table. So obviously this jury has seen that they are in handcuffs.

I believe both gentlemen also in their opening statements made statements about how long they had been — that they were prisoners at Hays and how long they had been at Hays. We're obviously dealing with an alleged murder that occurred at Hays. Now, so they've seen the handcuffs, the jury has. The Department of Corrections said this morning, overnight and this morning they have not had problems with either Mr. Rodriquez or Mr. Hill and asked if I want the handcuffs removed. I don't think I see a necessity to do that because, you know, the jury knows they're cuffed and if we have other prisoners testify today that might be testifying against one or either of the gentleman I see a problem with that. So that's the Court's decision and I'm going to leave it there.

On appeal, Hill contends that the trial court abused its discretion when it failed to make the necessary factual findings to justify its security decision; allow Hill the opportunity to challenge that decision by calling witnesses or holding a hearing; and consider

alternative security measures, especially in light of his pro se status. He further argues that the trial court's decision prejudiced his right to a fair trial. We agree.

(a) *Abuse of Discretion.*

It is well established that "no person should be tried while shackled . . . except as a last resort." *Illinois v. Allen,* 397 U. S. 337, 344 (90 SCt 1057, 25 LE2d 353) (1970). See also *Deck v. Missouri*, 544 U. S. 622, 626 (125 SCt 2007, 161 LE2d 953) (2005) ("The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need."). As explained by the United States Supreme Court, shackling is an inherently prejudicial practice that undermines the presumption of innocence in the eyes of the jury, hampers the defendant's ability to participate in his own defense, and impacts the overall dignity of the judicial process. See *Deck*, 544 U. S. at 630-631.

"Nevertheless, under some circumstances, shackling is necessary for the safe, reasonable and orderly progress of trial."

(Citation and punctuation omitted.) *United States v. Mayes*, 158 F3d 1215, 1225 (11th Cir. 1998). A trial judge has the discretion "to take account of special circumstances, including security concerns, that may call for shackling," but "any such determination must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial." *Deck*, 544 U. S. at 633. See also *Rhodes v. State*, 264 Ga. 123, 123 (2) (441 SE2d 748) (1994) ("Absent justifying circumstances, the defendant normally should not be seen by the jury handcuffed in the courtroom or courthouse." (citation and punctuation omitted)); *Mapp v. State*, 197 Ga. App. 7, 7 (397 SE2d 476) (1990) ("Appellant was entitled to have a trial free of restraint and free of partiality created by the use of shackles except where special circumstances exist, which in the discretion of the trial judge, dictate added security precautions." (citation and punctuation omitted)).

A trial court's decision to shackle a defendant "'must be subjected to close judicial scrutiny to determine if there was an essential state interest furthered by compelling a defendant to wear

shackles and whether less restrictive, less prejudicial methods of restraint were considered or could have been employed.'" *United States v. Durham*, 287 F3d 1297, 1304 (11th Cir. 2002) (quoting *Elledge v. Dugger*, 823 F2d 1439, 1451 (11th Cir. 1987), withdrawn in part, 833 F2d 250 (11th Cir.1987)). While this Court is deferential to the security determinations of a trial court, the record must provide a basis for those determinations. See *Martinez v. State*, 189 Ga. App. 69, 72 (2) (375 SE2d 123) (1988) ("[T]he cases holding no error was presented by the use of [restraining devices] have always relied on detailed, demonstrable evidence set forth in the record to support the infringement by the court on the defendant's presumption of innocence.").

In this case, the trial court made two separate decisions concerning whether it would shackle Hill — the first supposedly occurred pre-trial with the trial court's initial security plan, and the second occurred immediately before voir dire. The record before us does not support either of the trial court's decisions to visibly shackle Hill.

The record is mostly silent as to what was included in the trial court's first security plan and why the trial court came to its security decision. Although the trial court referenced numerous pre-trial meetings and hearings in support of its decision to keep Hill visibly shackled, neither the transcripts of those hearings nor the security plan itself are contained in the record. Even the trial court's limited discussion of this initial plan is vague. Because this Court cannot discern from the record what was included in the trial court's first security plan, or the reasons supporting the trial court's initial decision to shackle Hill, we must conclude that the trial court abused its discretion for failing to make the required case-specific and individualized findings to support its initial decision to shackle Hill. See *United States v. Baker*, 432 F3d 1189, 1244 (11th Cir. 2005), abrogated on other grounds by *Davis v. Washington*, 547 U. S. 813, 821 (126 SCt 2266, 165 LE2d 224) (2006) ("[I]f a judge intends to shackle a defendant, he must make a case specific and individualized assessment of each defendant in that particular trial." (citing *Deck*, 544 U. S. at 633)).

Possibly more concerning, however, is the trial court's decision on the morning of trial to keep Hill visibly shackled without first reassessing the appropriateness of such security measures in light of Hill's decision to proceed pro se. While the trial court's initial plan to have Hill sit at a separate table behind counsel would have shielded Hill's restraints from view, the court did not re-evaluate its plan in light of Hill's choice to represent himself. As previously discussed, a trial court's security determination requires balancing the need for security measures with protection of the defendant's constitutional rights. Hill's choice to represent himself introduced an additional factor that needed to be considered by the trial court — i.e., whether the shackles would impede Hill's ability to exercise his constitutional right to self-representation. See *Zygadlo v. Wainwright,* 720 F2d 1221, 1223 (11th Cir. 1983) (noting that a defendant's right to be tried free of restraints may outweigh security concerns). Yet, the trial court declined to revisit its decision in light of this new issue. Likewise, it refused to consider alternative and less visible security measures, even going so far as to blame the

visibility of Hill's shackles on his assertion of his constitutional right to represent himself at trial.[3]   While visible shackling may be appropriate in some cases, even with a pro se defendant, the record must reflect that the trial court considered the impact of visible restraints upon the defendant's constitutional rights, and whether less visible alternatives could achieve the required level of security. See *Holbrook v. Flynn,* 475 U. S. 560, 568 (106 SCt 1340, 89 LE2d 525) (1986) (noting that some extreme situations may warrant visible restraints).  See also *Potts v. State,* 259 Ga. 96, 100 (3) (376 SE2d 851) (1989) (no error where trial court took measures to prevent jurors from seeing defendant's leg irons); *Hicks v. State,* 200 Ga. App. 602, 603 (409 SE2d 82) (1991) (holding that the trial court's failure to consider intermediate security measures or alternate restraints, or to take precautions to shield defendant's visible shackles from jury's view, was an abuse of discretion).  The trial court failed to make a record of such considerations here.

---

[3] If the trial court did consider less visible alternatives, it did not do so on the record.

Finally, while the trial court seemingly based its decision to keep Hill visibly shackled, in part, upon an alleged threat he had made that morning, Hill disputed the information proffered by the prosecutor, which appears to have been hearsay as Hill claimed, and the trial court failed to establish a record — for example, by calling witnesses or holding an evidentiary hearing to support its determination that the threat warranted extra security measures. See *Elledge*, 823 F2d at 1451 (defendant must have adequate opportunity to challenge "untested information" underlying shackling decision); *Zygadlo,* 720 F2d at 1223-1224 (noting that due process may require an evidentiary hearing if the factual basis for security procedures was in dispute); *Rank v. Rank*, 287 Ga. 147, 149 (2) (695 SE2d 13) (2010) (noting that proffers only serve as evidence where not objected to by the opposing party). Cf. *Moon v. State*, 258 Ga. 748, 755 (12) (b) (375 SE2d 442) (1988) (no abuse of discretion where defendant did not request hearing or refute the information on which trial court made its security decision). By the trial court's own admission, it changed the original security plan based on this

purported threat, yet it failed to put new individualized findings on the record in support of this change. Indeed, while Hill was the only defendant alleged to have made a threatening statement prior to trial, the trial court forced both defendants to wear visible shackles. Moreover, when Hill requested that the trial court "state for the record what the security issues were with [him] that required restraints," the trial court refused to do so.

For all of these reasons, we conclude that the trial court abused its discretion by requiring Hill to be visibly shackled at trial.

(b) *Prejudice.*

This, however, does not end our inquiry. "On direct appeal where unconstitutional shackling has occurred, there is a presumption of harm that can be overcome only upon a showing by the State that the shackling was harmless beyond a reasonable doubt." *Whatley v. Terry*, 284 Ga. 555, 571 (V) (D) (668 SE2d 651) (2008). See also *Deck*, 544 U. S. at 635 ("[W]here a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual

prejudice to make out a due process violation. The State must prove beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained." (citation and punctuation omitted)). The State contends that any error in the trial court's decision was harmless because the evidence of Hill's guilt was overwhelming, the jury knew Hill was incarcerated because the murder took place in prison, and the jurors stated during voir dire that they could remain impartial even though the defendants were in restraints. We disagree.

Although the evidence presented at trial was sufficient to sustain Hill's conviction, it cannot be characterized as overwhelming. No witness saw Hill stab Morris. Although an officer reported seeing Hill trip Morris, Morris sprang back up without being stabbed, and the officer did not see Hill holding a weapon. The only witness to provide direct testimony in support of the State's theory that Hill was the mastermind behind the killing was Lucas, a fellow inmate who had also been indicted for Morris's murder and

was testifying pursuant to a plea deal.[4] Otherwise, the State relied on testimony from correctional officers that, during the post-incident search, Hill directed his fellow inmates to cooperate and appeared to be acting as the leader of the group. The State presented this fact as indicative of Hill's guilt, but his motive for encouraging the inmates' cooperation is not clear. And, although the State introduced a pair of pants, purportedly belonging to Hill, with Morris's blood on them, there is conflicting evidence concerning the collection and preservation of those pants.

Likewise, though the jury knew that Hill was incarcerated when the murder occurred, the State's theory of the case was that Hill was a dangerous individual who orchestrated an assassination plot while in prison. The appearance of Hill in handcuffs, a waist chain, and leg irons throughout his trial undoubtedly reinforced the impression that he was dangerous and framed the lens through which the jurors viewed Hill as he conducted his defense. See *Deck*,

---

[4] Lucas testified that he pled guilty to aggravated assault and received a ten-year sentence, with five of those years to be served on probation.

544 U. S. at 633 (appearance in shackles "inevitably affects adversely the jury's perception of the character of the defendant"); *Holbrook*, 475 U. S. at 569 (shackling is an "unmistakable indication[ ] of the need to separate a defendant from the community at large").

And finally, while Hill's codefendant questioned jurors as to whether they could remain impartial even though the defendants were in restraints, as explained by the United States Supreme Court,

> jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused. This will be especially true when jurors are questioned at the very beginning of proceedings; at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial.

*Holbrook*, 475 U. S. at 570. Consequently, we cannot say that the error was harmless beyond a reasonable doubt. Accordingly, we must reverse Hill's conviction.

3. Hill presented evidence at trial that one of the correctional officers filmed a portion of the post-incident search of

the inmates in the chow hall and that this video was not preserved by the State. Hill argues that his due process rights were violated because the State's failure to preserve the video denied him access to exculpatory evidence.

> In dealing with the failure of the state to preserve evidence which might have exonerated the defendant, a court must determine both whether the evidence was material and whether the police acted in bad faith in failing to preserve the evidence. *Arizona v. Youngblood*, 488 U. S. 51 (109 SC[t] 333, 102 LE2d 281) (1988). To meet the standard of constitutional materiality, the evidence must possess an exculpatory value that was apparent before it was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U. S. 479 (104 SC[t] 2528, 81 LE2d 413) (1984).

*Krause v. State*, 286 Ga. 745, 752 (8) (691 SE2d 211) (2010). See also *Davis v. State*, 285 Ga. 343, 349 (9) (676 SE2d 215) (2009) ("Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (citation and punctuation omitted)).

Hill claims that the video of the post-incident search was constitutionally material because the video would have shown him

wearing clean pants shortly after the attack. Hill alleges that because the officers were searching for inmates with soiled clothing in order to identify those involved in the attack, a video of Hill's clean clothing would have been exculpatory. A review of the record, however, shows that the exculpatory value of the video is not as great as Hill contends. Officers testified that Hill was detained, not because his clothes were soiled, but because he was acting strange and seemed to be "running the show" during the post-incident search. Moreover, the evidence presented at trial indicated that Hill was the mastermind of the attack on Morris, not that he was one of Morris' physical attackers. Accordingly, to the extent that video was exculpatory (and would have shown what Hill claims), we cannot say that the exculpatory value of the video was apparent before it was lost. And, thus, the evidence was not constitutionally material.

Additionally, there is no evidence that the State acted in bad faith. The officer who filmed the search was unable to be located for trial. However, pursuant to a stipulation by the prosecutor, his statements to a GBI investigator were admitted as evidence. The

officer did not remember to whom he gave the camera at the conclusion of the search and did not know what had happened to it. The GBI investigator testified that he spoke with everyone in administration at the prison about the video and that no one knew of its whereabouts.

> Even if we were to assume that the State's handling of the [video] indicated careless, shoddy and unprofessional investigatory procedures, it did not indicate that the police in bad faith attempted to deny [Hill] access to evidence that they knew would be exculpatory.

(Citation and punctuation omitted.) *Davis*, 285 Ga. at 349 (9). Based on the foregoing, the State did not violate Hill's right to due process.

4. Because we have concluded that the evidence at trial was sufficient to sustain Hill's conviction, the State may choose to re-try him. See *Williams v. State*, 258 Ga. 305, 311 (1) (369 SE2d 232) (1988). However, we do not address Hill's remaining enumerations of error, as they are not likely to recur in the event of a retrial. See *Allaben v. State*, 294 Ga. 315, 322 (3) (751 SE2d 802) (2013), overruled on other grounds by *State v. Springer*, 297 Ga. 376 (774 SE2d 106) (2015).

*Judgment reversed. All the Justices concur, except Blackwell, Boggs, and Ellington, JJ., who concur in judgment only.*

DECIDED MAY 4, 2020.
Murder. Chattooga Superior Court. Before Judge Graham.
*Christina R. Cribbs, Veronica M. O'Grady*, for appellant.
*Herbert E. Franklin, Jr., District Attorney, Christopher A. Arnt, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.