NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0215
Phun Kam
v.
The State

On Appeal from the Superior Court of DeKalb County
No. 21CR2697-1

Decided: May 19, 2026

LAND, Justice.

Phun Kam appeals his 2024 convictions for malice murder and related charges stemming from the shooting death of Hrin Thawng.[1] Kam argues that the evidence was constitutionally insufficient to support his convictions, the trial court abused its dis-

---

[1] The crimes took place on May 9, 2021. On August 3, 2021, a DeKalb County grand jury indicted Kam for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), and possession of a firearm during commission of a felony (Count 4). Kam's first trial, from August 28 to September 6, 2023, ended in a hung jury. After Kam's second trial, from March 25 to March 28, 2024, a jury returned a verdict of guilty on all counts of the indictment. Kam was sentenced to life in prison for Count 1 and 5 years in prison for Count 4 (which was suspended but was to be served consecutive to Count 1). Count 2 was vacated by operation of law and Count 3 was merged with Count 1.

Kam filed a timely motion for new trial on April 29, 2024, and amended that motion through new counsel on May 19, 2025. After a hearing, the trial court denied the amended motion for new trial on July 2, 2025, and Kam filed a timely notice of appeal. Kam's appeal was docketed to the term of this Court beginning in December 2025 and submitted for a decision on the briefs.

cretion in admitting Kam's statement at the time of his arrest because he was not fluent in English, the trial court erred in not holding a hearing and not making the required findings before ordering Kam shackled during trial, the trial court abused its discretion in not allowing a forensic pathologist to testify as to Thawng's blood alcohol content, and the verdict form violated due process because it incorrectly negated a possible voluntary manslaughter verdict. For the reasons that follow, we affirm.

1. The evidence presented at trial showed as follows. Kam and Thawng worked together and lived in the same apartment complex. The two men would frequently drink alcohol together. Kam testified that Thawng would act "crazy" when he was drunk and described a fight that occurred in the year before the shooting where Thawng was "tipsy" and stabbed Kam with a knife.[2] Despite this, Kam still described Thawng as his "best friend."

Kam testified that the day before the murder, on May 8, 2021, Kam and Thawng drank beers in Thawng's apartment before going to Sawkyaw Phone's apartment to drink more beer.[3] Phone testified that Kam and Thawng appeared to have an argument at his apartment before both men left. Phone testified that Thawng did not appear to be drunk, although Kam testified that he went home because Thawng was drunk and Kam was worried since Thawng previously stabbed him while intoxicated.

Thawng's phone called Kam's phone via Facetime "four or

---

[2] It is unclear precisely how long before Thawng's shooting this fight occurred. Moses Lian, who lived with Kam, testified he was not sure when exactly this fight occurred, but that he believed it was possibly "months" before the shooting. Kam told officers at his post-arrest interview that the fight occurred "last year."

[3] Kam testified that he left Thawng's apartment "between 7 and 8 p.m." and went home for "40 [to] 50 minutes" before walking to Phone's apartment.

five times" after Kam went home, and cell phone record data shows that the last call from Thawng's phone to Kam's phone was at 1:36 a.m. on May 9. Cell phone data indicated that there were 12 calls between Kam and Thawng's phone between 11:59 p.m. on May 8 and 1:36 a.m. on May 9. Five of those calls were from Kam's phone to Thawng's phone, and two of those five calls were actually answered by Thawng's phone, resulting in one 50-second conversation and one approximately four-minute conversation.

During a recorded interview with investigators, portions of which were played for the jury, Kam told investigators that Thawng came to his apartment and started yelling at him through Kam's closed door and knocking on the door. At trial, however, Lian testified that he did not hear any "yelling" or "banging on the front door" before the shooting, and Kam's neighbor likewise testified that he woke up to a "big sound" but did not "hear any arguing."

Kam told investigators that he told Thawng he had a gun and Thawng told Kam that he also had a gun and had more bullets in his gun than Kam had in his gun. When investigators asked Kam if Thawng showed him a gun or if Kam saw a gun, Kam said no. At trial, however, Kam testified that he "slowly" opened his door to look at Thawng, saw that Thawng was "holding [something] in his hands" and "aiming with" something, and that Thawng tried to get inside Kam's apartment. Kam testified that he fired several shots through his door, striking Thawng. Kam then opened the door and called 911 because Thawng was "not dead yet."

Detective Bryan Smith, who responded to the scene, testified that Kam's front door had "six bullet defects." Detective Smith testified that investigators recovered seven shell casings, one of which failed to eject from Kam's gun. Thawng was found

3

lying with his head near a flower pot outside of Kam's apartment building, and investigators found a "pancaked" bullet in the pool of blood around Thawng's head, as well as what Detective Smith testified appeared to be "brain matter and skull fragments." Detective Smith further testified that for the bullet to "pancake" like that, the shooter would "have to point the muzzle of that gun almost straight down [on] that hard surface" – such as concrete – and that he would not expect the bullet to "pancake" if the bullet had been shot from the apartment. A "high velocity spatter" blood pattern was visible around Thawng's head, which Detective Smith testified would have been caused by "[Thawng] having been shot in the head."

At least two of the bullets fired through the door hit Thawng, with the medical examiner who conducted Thawng's autopsy testifying that one bullet hit Thawng in his left thigh and the other hit him in his torso and lodged in his spine. Although Kam denied that he went outside of the apartment to shoot Thawng again, the medical examiner testified that the third gunshot wound to Thawng's head showed a "shored exit wound," meaning Thawng was shot with "his head … against a hard surface."

The medical examiner testified that Thawng was shot in the head from no more than "[two] to [three] feet" away because his head wound showed signs of "stippling," which consists of "small abrasions caused by burning … unburned powdered grains as they strike the skin." The medical examiner was unable to determine how far away Kam was when he shot Thawng in the thigh because that bullet passed through Thawng's cell phone, a piece of which was found lodged in Thawng's body, and she was likewise unable to determine how far away Kam was when he shot Thawng in the torso because that bullet also went "through

4

some other object." The medical examiner explained that this torso wound showed "pseudo-stippling," meaning that the bullet went "through some other object" and that object "fragmented into some number of pieces, and those pieces hit the skin and caused the abrasion[s]."

The medical examiner concluded that Thawng died of gunshot wounds to the head and torso. The gunshot wound to the torso, which lodged in Thawng's spine, may have caused him to collapse, as the medical examiner testified that "a bullet striking … a thoracic vertebrae" can cause "a concussion of the spinal cord," which would be "consistent with an individual collapsing." Investigators did not find any firearms on or around Thawng's body.

2. Kam argues that the evidence was constitutionally insufficient to support his conviction for malice murder. We disagree.

When considering whether the evidence is constitutionally sufficient to support a conviction, "we view the evidence in the light most favorable to the verdict and evaluate whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." See *Davenport v. State*, 309 Ga. 385, 388 (2020) (citing *Jackson v. Virginia*, 443 US 307, 319 (1979)). "[W]e must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." Id. at 388 (citation and punctuation omitted). Kam admits that he shot Thawng, and a jury would be authorized to find that Kam did not do so in self-defense given the absence of evidence supporting Kam's claim that Thawng was armed, Kam's statements to investigators that he

5

saw no gun in Thawng's possession, the conflicting evidence concerning whether Thawng and Kam were arguing before the shooting, and the strong evidence that Kam exited his apartment and shot Thawng in the head from close range as Thawng lay on the ground. See, e.g., *Pritchett v. State*, 314 Ga. 767, 771 (2022) (evidence was sufficient for the jury to reject the defendant's self-defense theory when forensic and crime scene evidence did not support that theory).

To the extent Kam argues that his conviction for malice murder was improperly based on circumstantial evidence, that claim also fails.[4] "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. But "if there is any direct evidence presented by the State, the circumstantial evidence statute does not apply in a sufficiency analysis." *Bradley v. State*, 318 Ga. 142, 144 (2024). "Direct evidence includes a defendant's admissions and testimony about those admissions." *Green v. State*, 322 Ga. 617, 620–21 (2025). Here, Kam admitted he shot Thawng, so his conviction is not based solely on circumstantial evidence, and Kam's circumstantial evidence argument is meritless. See id.

It is unclear from Kam's briefing whether he challenges the sufficiency of the evidence underlying his conviction for possession of a firearm during the commission of a felony. Nevertheless, to the extent Kam's briefing can be construed to challenge this conviction, we find the evidence is sufficient to support this conviction. Kam admits to using a firearm to shoot Thawng. And, as

---

[4] Kam cites to *Jackson v. Virginia*, *Brown v. State*, 250 Ga. 862 (1983), and OCGA § 24-14-6 but fails to make any argument to support this enumeration.

6

discussed above, the evidence is sufficient to support Kam's murder conviction arising from that shooting. Thus, the evidence is sufficient to support the conviction for possession of a firearm during the commission of a felony. See OCGA § 16-11-106 (making it a felony for any person in possession of a firearm to commit "[a]ny crime against … the person of another," provided that crime is a felony).

3. Next, Kam argues that the trial court abused its discretion in admitting Kam's post-arrest statement because he was not fluent in English and the officer who took his statement was not fluent in Burmese. This enumeration fails.

Kam was interviewed by two detectives following his arrest. He was read his *Miranda*[5] rights, and he signed a written acknowledgement of those rights which indicated he still wished to speak to detectives. The trial court held a pre-trial *Jackson-Denno*[6] hearing to determine the admissibility of Kam's recorded post-arrest statement to investigators. After this hearing, the trial court issued an order finding that Kam "[understood] enough English to comprehend the explanation of *Miranda* rights" and that Kam could "communicate effectively enough in English to waive those rights." The trial court "listen[ed] repeatedly to the recording of [Kam's] statement" and observed that "at no time during [Kam's] interactions with the responding officer or during the interview with the detectives did [Kam] state that he required an interpreter to communicate, nor did he appear to not understand what was being asked of him." A recording of Kam's interview was admitted at trial over trial counsel's objections, and portions of the interview were played for the jury. After the motion for new trial hearing, the trial court again ruled that Kam's post-

---

[5] *Miranda v. Arizona*, 384 US 436 (1966).
[6] *Jackson v. Denno,* 378 US 368 (1964).

7

arrest statement was made "freely and voluntarily," observing that Kam "never requested an interpreter to communicate," that it did not "appear that he did not understand the questions" being asked of him, and that his "answers during the interview were responsive to the questions posed by the detective."

"In ruling on the admissibility of an in-custody statement, the trial court must look to the totality of the circumstances to decide whether the statement was made freely and voluntarily." *Milinavicius v. State*, 290 Ga. 374, 375 (2012). We "will not disturb the trial court's factual and credibility determinations unless they are clearly erroneous." *Perez v. State*, 309 Ga. 687, 692 (2020) (cleaned up). When "some or all of the material facts [are] undisputed, we properly may take notice of the undisputed facts — even if the trial court did not — without interfering with the prerogative of the trial court to resolve disputes of material fact." *State v. Franklin*, 318 Ga. 39 (2024). "Such undisputed facts include, among other things, those which definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility." Id. at 39 n.1 (cleaned up). "Generally, if there is evidence supporting the trial court's decision to admit statements, it will be upheld on appeal." *Milinavicius*, 290 Ga. at 375.

In the recording, Kam provided detailed responses to the investigator's questions, indicating that he understood enough English to comprehend *Miranda* warnings. When asked whether he could "read and write English," Kam responded "yes." Kam also asked for clarification as needed when he did not understand what the officers were saying. Our review of the recorded interview confirms that the evidence supports the trial court's conclusion that Kam understood enough English to comprehend the *Miranda* warnings and the questions being asked of him and that he

8

gave his statement freely and voluntarily.[7] Thus, the trial court did not abuse its discretion in admitting his post-arrest statement to the detectives. See *Milinavicius,* 290 Ga. at 376 (affirming trial court's finding that appellant understood enough English to knowingly and voluntarily waive his *Miranda* rights when video recording of in-custody interview supported the trial court's conclusion).

4. Kam argues that the trial court erred in not holding a hearing before ordering Kam shackled during trial and by not addressing the required factors for shackling a defendant during trial, as mandated by *Hill v. State*, 308 Ga. 638 (2020). While we have concerns about the shackling of Kam under the circumstances of this case, we see no reversible error. Thus, this enumeration fails.

First, Kam's argument concerning the trial court's alleged failure to conduct a hearing before ordering that he be shackled is not supported by the record. The trial court heard argument from counsel on this issue before ordering Kam to be shackled, and Kam does not explain how this did not constitute a hearing. This portion of Kam's argument is meritless.

Second, with respect to the issue of why Kam was shackled, the record reflects that the State requested shackles because "the sheriff's office ha[d] asked that he be in leg shackles" and the State "[felt] that's appropriate given [Kam's] charges." The trial court overruled Kam's objection to shackling, reasoning that Kam was shackled in his previous trial, that curtains around the table prevented the jury from seeing the shackles, and that if Kam

---

[7] Kam does not argue or point to evidence suggesting that his statement was coerced or otherwise given involuntarily for any reason other than the alleged language barrier.

needed to be moved about the courtroom, he could be moved outside of the presence of the jury. Prior to Kam's testimony at trial, the trial court excused the jury, asked Kam to move to the witness stand, and confirmed that Kam's shackles could not be seen by jurors. The jury was excused after Kam's testimony concluded and before he was moved back to the defense table. Kam's trial counsel agreed that the shackles were not visible at trial, and his motion for new trial counsel stated that "as far as I know, the jury was not directly aware that [Kam] was shackled."

We have previously stated that "no person should be tried while shackled except as a last resort." *Hill*, 308 Ga. at 644 (cleaned up). "A trial judge has the discretion to take account of special circumstances, including security concerns, that may call for shackling, but any such determination must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial." Id. The trial court's decision to shackle a defendant must "be subjected to close judicial scrutiny to determine if there was an essential state interest furthered by compelling a defendant to wear shackles and whether less restrictive, less prejudicial methods of restraint were considered or could have been employed." Id. (citation and punctuation omitted). "While this Court is deferential to the security determinations of a trial court, the record must provide a basis for those determinations." Id.

There is nothing in this record showing that Kam was shackled due to any particular, case-specific security concern. In addition, the record does not reflect that the trial court considered any less restrictive method of restraint other than shackling. Thus, we have concerns that the shackling in this case did not occur "as a last resort[,]" id., but may have instead occurred as part of a routine practice of shackling defendants charged with

10

murder.

Nonetheless, even if we were to assume the shackling in this case was constitutionally impermissible, we find that under the circumstances present here, any assumed error was harmless. "On direct appeal where unconstitutional shackling has occurred, there is a presumption of harm that can be overcome only upon a showing by the State that the shackling was harmless beyond a reasonable doubt." *Wallace v. State*, 320 Ga. 272, 283 (2024) (citation omitted). In *Wallace*, we concluded that the State carried its burden of proving that shackling was harmless beyond a reasonable doubt because the trial court found the leg iron was not visible, the appellant affirmatively brought the existence of the leg iron to the jury's attention as a part of appellant's trial strategy, the State presented strong evidence of appellant's guilt, and the trial court properly instructed the jury on the presumption of innocence and the burden of proof. Id. at 283–84.

As in *Wallace*, the State demonstrated that the shackling was not visible at trial. This is a critical factor, as the United States Supreme Court has recognized that due process "prohibit[s] the use of physical restraints *visible to the jury* absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 US 622, 629 (2005) (emphasis added). Moreover, the evidence of Kam's guilt was strong, as he admitted that he shot Thawng, and any evidence supporting Kam's theory of self-defense was weak in comparison to the forensic evidence that Kam shot Thawng in the head as Thawng lay helpless on the floor. The trial court also properly instructed the jury on the presumption of innocence and the burden of proof. And there was no evidence that Kam's shackling impeded his ability to conduct his defense or that the jury was aware that Kam was shackled. Thus,

under these circumstances, we find beyond a reasonable doubt that any unconstitutional shackling of Kam was harmless.

5. Kam argues that the trial court abused its discretion in excluding evidence of Thawng's blood alcohol content. Even assuming that the trial court abused its discretion in excluding such evidence, Kam has failed to show harm.

During trial, the State made an oral motion in limine seeking to exclude toxicology results showing that Thawng's blood alcohol content on the night of his death was .272.[8] The State did not object to evidence of Thawng's alcohol consumption or its effect on him; rather, it objected only to the fact that his blood alcohol content was measured at .272 after his death. After a hearing, the trial court excluded the evidence, finding that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice to the State.

Even if the trial court's ruling was an abuse of discretion, it was harmless. "If the trial court abuses its discretion in excluding evidence, we will reverse a conviction for a trial court's evidentiary error only if it was harmful." *Tarver v. State*, 319 Ga. 165, 169 (2024). "It is well settled that the test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." Id. at 169-70 (cleaned up).

The evidence against Kam was strong, and even without the admission of evidence of Thawng's blood alcohol content, the jury was made aware that Thawng had been drinking that night. Specifically, the jury heard evidence that Thawng and Kam had both been drinking before the shooting, that Thawng had been violent toward Kam in the past when intoxicated, that Thawng

---

[8] During Kam's first trial, the trial court admitted this evidence.

12

was unarmed at the time of the shooting, that others in the vicinity of the shooting had not heard the argument that allegedly occurred between these two men prior to the shooting, and that Kam shot Thawng in the head as he lay on the ground outside his apartment. The exit wound to Thawng's head was "shored," meaning Thawng was shot with his head against a hard surface. A deformed bullet, found in the puddle of blood where Thawng's head lay, was "pancaked," which Detective Smith testified meant that the shooter would "have to point the muzzle of that gun almost straight down [on] that hard surface." Additionally, the State's medical examiner was able to determine that Thawng was shot in the head from no more than three feet away but was unable to make that determination for Thawng's other wounds because those bullets passed through intermediary objects (such as Thawng's phone or Kam's apartment door) before entering Thawng's body. Under these circumstances, it is highly probable that the outcome of Kam's trial would not have changed if Thawng's blood alcohol content had been admitted.

6. Finally, Kam argues that the verdict form utilized in this case "violated due process of law" because it "incorrectly negated a possible voluntary manslaughter verdict."

Kam did not object to the verdict form at trial, and Kam's appellate counsel concedes this claim is subject to plain error review.

To show plain error,

the appellant must demonstrate that the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. Satisfying all four prongs of this

standard is difficult, as it should be.

*Mayo v. State*, 319 Ga. 34, 40 (2024) (citation omitted). "When determining whether there is error regarding a … verdict form, the 'form is treated as part of the jury instructions which are read and considered as a whole.'" Id. at 39.

We have reviewed the verdict form, and there is nothing about it that "negated a possible voluntary manslaughter verdict." Moreover, the trial court correctly instructed the jury on voluntary manslaughter. Kam provides no citations to the record or any argument in support of this enumeration other than a bald assertion that the verdict form violated *Edge v. State*, 261 Ga. 865, 867 (1992) ("A sequential charge requiring the jury to consider voluntary manslaughter only if it has considered and found the defendant not guilty of malice murder and felony murder is not appropriate where there is evidence that would authorize a charge on voluntary manslaughter."). By failing to articulate any cogent argument as to how Kam's verdict form allegedly negated a voluntary manslaughter verdict or otherwise violated *Edge*, Kam has failed to carry his burden under our standard for plain error review. See *State v. Kelly*, 290 Ga. 29, 32 n.2 (2011) ("[P]arties should be advised that the hurdle to establishing plain error is high … and therefore that the failure to specifically articulate how the alleged error satisfies this high standard increases the likelihood that their claims in this regard will be rejected"). Accordingly, this enumeration fails.

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*