313 Ga. 716
FINAL COPY

S22A0100. MUNN v. THE STATE.

MCMILLIAN, Justice.

Mark Munn appeals his convictions for malice murder and

other crimes arising out of the shooting death of Kalliber Chambers.[1]

On appeal, Munn asserts that: (1) the evidence presented at his trial

was insufficient to sustain his conviction for malice murder; (2) the

trial court erred in failing to charge the jury on the lesser offense of

---

[1] Chambers was killed on March 3, 2018, and in July 2019, a Douglas County grand jury indicted Munn for one count of malice murder (Count 1), one count of felony murder (Count 2), one count of aggravated assault (Count 3), a second count of felony murder (Count 4), and one count of possession of a firearm by a convicted felon (Count 5).

At a trial conducted from October 21 through 25, 2019, a jury found Munn guilty on all counts. On November 6, 2019, the trial court sentenced Munn to serve life in prison without the possibility of parole for malice murder with five years to serve consecutively for possession of a firearm by a convicted felon. Counts 2 and 4 were vacated by operation of law, and Count 3 merged into Count 1 for sentencing purposes.

Munn filed a timely motion for new trial through new counsel on November 14, 2019, which was amended on February 11 and 17, 2021. After a hearing, the trial court denied the motion, as amended, on April 28, 2021. Munn filed a timely notice of appeal on May 27, 2021; the case was docketed to the term of this Court beginning in December 2021 and submitted for a decision on the briefs.

voluntary manslaughter; (3) the trial court committed plain error by failing to charge the jury on Munn's sole defense of justification; (4) the trial court placed Munn in shackles before the jury, denying Munn his right to a fair trial and due process; (5) the trial court erred in admitting the responding officer's body camera footage; (6) the trial court erred in admitting a recording of phone calls made from jail by Munn; (7) the trial court erred in denying Munn's *Jackson-Denno*[2] motion; and (8) Munn received ineffective assistance of counsel. We affirm for the reasons discussed below.

Viewed in the light most favorable to the jury's verdict, the evidence showed that 13-year-old K. C. lived in the Birch Landing Apartments ("Birch Landing") with her mother. Her adult brother, Chambers, did not live there but visited "every day." On March 3, 2018, K. C. was at Birch Landing playing outside with other children while her brother and other adults were also outside. A grey car sped by and pulled into a parking space. As the driver began walking toward the apartments, Chambers confronted the driver about

---

[2] See *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

almost hitting the kids playing, and the driver pulled out a weapon and pointed it at Chambers. Chambers put his hands up and asked, "You going to shoot me?" The man then started shooting Chambers; afterward, the man drove away in a red car.

Numerous eyewitnesses identified the shooter as Munn. A neighbor, Joy Smith, testified that she was familiar with Munn because his girlfriend, Tameka Brooks, lived in the apartment across the hall from Smith. Brooks and Munn had three cars including a silver sedan and a red Dodge Charger.[3] On the day of the shooting, Smith's 12-year-old son was playing outside with K. C. and other children. That afternoon, Smith noticed that it "[s]eem[ed] like something was going on" between Brooks and Munn before Munn left in a silver sedan. Munn later returned, speeding through the parking lot and almost hitting the children playing. Chambers told Munn to slow down, but Munn responded, "F*** them kids." Smith

---

[3] Brooks testified that she owned a 2004 Nissan Murano and a 2004 Altima and that Munn owned a red Dodge Challenger. Brooks explained that all three cars stayed at Birch Landing and that Munn usually drove the Challenger. It appears that the witnesses referring to the Charger were likely referring to the Challenger.

heard Chambers ask if Munn was going to shoot him and saw Munn pull out a handgun and fire four or five shots into Chambers. The two men were standing about a car's length apart. Munn then screamed for Brooks to give him the keys, she threw him the keys, and Munn left in the red "Charger." Smith called 911, and the phone call was played for the jury.[4]

Another witness, Malcome McGee, arrived at Birch Landing about 15 minutes before the shooting. McGee was sitting in the driver's seat of his own car, and Chambers was standing next to McGee's open car door. McGee saw Munn, whom he knew, drive into the parking lot and park one space away from McGee's car. When Chambers asked Munn to slow down, Munn stepped out of the car and said, "Don't play with me." Munn and Chambers's conversation was not long. Munn fired six or seven shots, and Chambers fell down face first. McGee and another witness turned Chambers over, and McGee saw the holes in Chambers's abdomen.

---

[4] At least two other witnesses, who either saw the shooting or heard the shots from inside, also called 911, and these calls were also played for the jury.

Other eyewitnesses present on March 3 testified that when Chambers asked Munn to slow down because of the kids, Chambers did so in a normal, non-threatening tone. After Chambers spoke to Munn, one witness heard Munn respond, "What did you say?" — prompting Chambers to again ask Munn to slow down, with no anger in his voice. Witnesses saw Munn draw a small-caliber handgun and Chambers throw his hands up stating, "I know you're not going to shoot me." Another witness stated that Munn fired six to eight shots before fleeing in a red Challenger.

Brooks testified that, in 2018, she lived in Birch Landing and that Munn was her boyfriend; he regularly stayed with her. On March 3, Brooks and Munn went to the nail shop and then to Applebee's. After they returned to Birch Landing, Munn's mother called, requesting food. Brooks and Munn got into a disagreement because Brooks did not want to leave;[5] Munn became upset and left in the Altima to take his mother food. When Munn returned, he

---

[5] According to Brooks's testimony, and that of the other witnesses, it was a nice day and members of the community were hanging out in the parking lot, drinking alcohol, and playing music.

parked the car and started walking toward the apartments. Chambers asked Munn to slow down, and Munn and Chambers exchanged words. Munn pulled out a gun[6] and immediately started shooting; Chambers put his hands up and fell to the ground. Munn asked Brooks for the keys to the Challenger, which she threw to him, and Munn drove away. Munn never told Brooks that he was planning to shoot or hurt Chambers.

Deputy Michael Long, one of the responding officers on March 3, 2018, testified that he arrived at Birch Landing before emergency medical services. While another deputy was attending to Chambers, Deputy Long secured the scene and collected contact information from witnesses. His body camera video recording, which was played for the jury, showed unsolicited comments from several people, including two people who spoke about what they had witnessed: that the shooter shot Chambers for no reason and that the shooter had

---

[6] Brooks was shown the murder weapon and testified that it was her gun. She purchased the gun in June 2017, and Munn was with her when she bought it.

left the scene.[7]

Stephen Albright, a paramedic for the Douglas County Fire Department, responded to the call around 5:30 p.m. on March 3 and arrived at Birch Landing around 5:45 p.m. He transported Chambers to the hospital a few minutes later, where Chambers was declared dead. The medical examiner who conducted the autopsy testified that Chambers suffered three gunshot wounds through his torso and one wound through his right arm. All three torso wounds were severe, causing internal bleeding, and one of the gunshots perforated the heart. The medical examiner opined that the cause of death was multiple gunshot wounds.

Crime scene investigator Joe Williams testified that he arrived at the scene after Chambers was transported to the hospital. Williams testified that three nine-millimeter cartridge casings were recovered from the parking lot. A GBI firearms investigator testified that these cartridge cases were fired from a nine-millimeter pistol

---

[7] Because so many people were talking at once on the video recording, it is difficult to hear whether anyone identified Munn as the shooter.

later recovered from Munn's vehicle.

Once in custody, Munn was interviewed by Investigator Jay Hayes. Investigator Hayes conducted two separate interviews with Munn on March 4: the first at 12:40 a.m. and the second at 4:30 p.m. Both interviews were audio and video recorded and introduced into evidence.[8] During the first interview, Munn was communicative and answering questions. Munn insinuated that Chambers was a "Crip" gang member and acknowledged knowing that Chambers was dead, but denied shooting him. Munn also provided an alibi and questioned Investigator Hayes about why there were eight holes in Chambers if there were only five shots. Investigator Hayes ultimately stopped this interview because he decided to interview Munn again later when Munn was more sober. During the second interview, Munn accepted responsibility for the shooting, acknowledged that he shot Chambers multiple times, and said he had no reason to shoot Chambers. Investigator Hayes searched

---

[8] Investigator Hayes testified that he advised Munn of his *Miranda* rights before both interviews and that both times Munn waived his rights. See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Munn's Dodge Challenger and found the nine-millimeter pistol in the center console. Two days later, on March 6, Munn called Investigator Hayes from the jail.[9] During this phone call, Munn said "[Chambers] was running at me, man," and "he run up on me like that," and that Chambers said, "I don't give a f*** bout you got a pistol on you bruh," implying that Chambers had a weapon on him.

Munn did not testify at trial, but recordings of several phone calls made by Munn to Brooks from jail were introduced into evidence and played for the jury. In these calls, Munn repeatedly admitted to Brooks that he killed Chambers, and he expressed guilt over the situation. At trial, defense counsel moved generally to exclude the jail calls and specifically moved to exclude the "one where Mr. Munn is heard saying words that basically he's done this [i.e., killed] before," arguing that it was highly prejudicial character evidence. The court overruled the objection and admitted the jail

---

[9] A recording of this phone call was also played for the jury and introduced into evidence.

calls.[10]

1. In his first enumeration of error, Munn asserts that the evidence presented at trial was insufficient to sustain his conviction for malice murder under OCGA § 16-5-1 (a) because the facts did not support a finding that Munn acted with malice aforethought. In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted).

OCGA § 16-5-1 (a) provides that "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." However, "[t]he malice necessary to establish malice murder may be formed in an instant, as long as it is present at the time of the

---

[10] The phone calls are largely unintelligible but both the State and counsel agreed in the colloquy with the trial court about whether to admit the calls that Munn said something to the effect that he had killed before.

10

killing." *Benton v. State*, 305 Ga. 242, 244 (1) (a) (824 SE2d 322) (2019). It is for the jury to weigh the evidence and determine whether a killing is intentional and malicious. See id.

Here, there was more than sufficient evidence of malice. Multiple witnesses testified that Chambers approached Munn about his driving, causing Munn to become angry. Munn shot Chambers multiple times, despite Chambers raising his hands. By Munn's own admission, he shot Chambers while Chambers was unarmed and unthreatening.[11] Thus, the evidence was sufficient to support the finding that Munn was guilty of malice murder. See *Williams v. State*, 306 Ga. 674, 675 (1) (832 SE2d 843) (2019) (finding implied malice where appellant shot unarmed victim leaving the scene after

---

[11] Even though Munn also stated that Chambers had run at him while saying that Chambers did not care that Munn had a gun, the jury was authorized to disbelieve that statement, and it does not preclude a conclusion that the evidence was sufficient to find Munn guilty of malice murder. "[I]t is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the jury." *Graves v. State*, 298 Ga. 551, 553 (1) (783 SE2d 891) (2016). See also *Miller v. State*, 312 Ga. 702, 706 (2) (864 SE2d 451) (2021) (conflicts in the evidence do not warrant a reversal of the defendant's conviction because the evidence was sufficient to enable "a rational jury . . . to weigh the evidence, credit the testimony of the witnesses, and to find [the defendant] guilty of malice murder").

victim started argument over minor personal property dispute); *Moran v. State*, 302 Ga. 162, 164 (1) (b) (805 SE2d 856) (2017) (evidence of malice where appellant shot victim at close range "as he tried to escape").

2. Munn contends that the trial court erred in refusing his request to charge the jury on the lesser offense of voluntary manslaughter.

> [A] trial court is required to grant the defendant's request for a charge on the lesser included offense of voluntary manslaughter if there is any evidence, however slight, to support such a charge. Whether such slight evidence exists is a question of law. The crime of voluntary manslaughter is committed when one kills "solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a).

*Blake v. State*, 292 Ga. 516, 518 (3) (739 SE2d 319) (2013) (citations omitted).

Munn argues that Chambers's confrontation about Munn's driving, Chambers's escalation of the argument after Munn stated he did not want to talk, and Munn's knowledge of Chambers's street name, "Crip" (demonstrating affiliation with a known violent street

12

gang), are evidence that Munn acted as the result of serious provocation. But, "words alone . . . will not . . . justify the excitement of passion so as to reduce the crime from murder to manslaughter, where the killing is done solely on account of the indignation aroused by the use of opprobrious words." *Brooks v. State*, 249 Ga. 583, 586 (292 SE2d 694) (1982) (citation, punctuation and emphasis omitted). See also *Jones v. State*, 301 Ga. 1, 6 (2) (799 SE2d 196) (2017) (neither angry statements nor fear of fighting is sufficient to demand voluntary manslaughter instruction), overruled in part on other grounds by *Worthen v. State*, 304 Ga. 862 (823 SE2d 291) (2019). And killing due to fear for one's life does not alone support that one acted "due to irresistible passion." *Dugger v. State*, 297 Ga. 120, 124 (7) (772 SE2d 695) (2015). There was no evidence to support a voluntary manslaughter charge here, and this enumeration is without merit.

3. Munn asserts that the trial court committed plain error by failing to charge the jury on his sole defense of justification because

13

there was slight evidence to support the charge.[12] Where a defendant

does not request that the trial court give a jury instruction, as Munn

admits he did not here, this Court only reviews for plain error. See

*White v. State*, 291 Ga. 7, 8 (2) (727 SE2d 109) (2012).

> To establish plain error, an appellant must meet each
> prong of a four-prong test: First, there must be an error
> or defect — some sort of deviation from a legal rule — that
> has not been intentionally relinquished or abandoned,
> i.e., affirmatively waived, by the appellant. Second, the
> legal error must be clear or obvious, rather than subject
> to reasonable dispute. Third, the error must have affected
> the appellant's substantial rights, which in the ordinary
> case means he must demonstrate that it affected the
> outcome of the trial proceedings. Fourth and finally, if the
> above three prongs are satisfied, the appellate court has
> the discretion to remedy the error — discretion which
> ought to be exercised only if the error seriously affects the
> fairness, integrity, or public reputation of judicial
> proceedings.

---

[12] OCGA § 16-3-21 (a) provides:
    A person is justified in threatening or using force against
another when and to the extent that he or she reasonably believes
that such threat or force is necessary to defend himself . . . against
such other's imminent use of unlawful force; however, . . . a person
is justified in using force which is intended or likely to cause death
or great bodily harm only if he or she reasonably believes that such
force is necessary to prevent death or great bodily injury. . . .

*Washington v. State*, 312 Ga. 495, 498 (1) (863 SE2d 109) (2021) (citation and punctuation omitted). "[W]e need not analyze all of the elements of this test when . . . the defendant has failed to establish one of them." *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2) (b) (818 SE2d 552) (2018).

To authorize a jury charge, there must be slight evidence supporting the charge. See *Floyd v. State*, 307 Ga. 789, 798 (3) (837 SE2d 790) (2020); *Tarvestad v. State*, 261 Ga. 605, 606 (409 SE2d 513) (1991). Here, Munn claims the prosecutor acknowledged during the charge conference that there was evidence to support a justification defense, presumably referring to Munn's statement that Chambers ran up to him saying that Chambers did not care that Munn had a gun. Even assuming that is true, we fail to see how the failure to give the charge would have affected the outcome of the proceedings. Munn's self-serving statement was the only evidence even arguably supporting a justification defense; in comparison, multiple eyewitnesses testified that Munn shot an unarmed Chambers after Chambers threw his hands up and Munn admitted

15

in his second police interview that he shot Chambers multiple times for no reason. See *Jones v. State*, 310 Ga. 886, 889 (2) (855 SE2d 573) (2021) (harmless error to fail to charge on defense of self or third person because "to the extent there was any evidence supporting a charge on defense of self or a third person, it was meager at best" and the video recording of the shooting showed that the defendant was not in such danger that he reasonably believed that it was necessary to fire his gun to protect himself or his friend); *Calmer v. State*, 309 Ga. 368, 372-73 (2) (c) (846 SE2d 40) (2020) (assuming that slight evidence existed to support the requested charges on self-defense and no duty to retreat, the trial court's failure to charge on these principles was harmless error because "any weak inference that [the defendant] acted to prevent death or great bodily injury to himself is wholly undercut by other evidence to the contrary"). We discern no plain error here in failing to charge on justification.

4. Munn next asserts that the trial court denied Munn his right to a fair trial and due process by placing Munn in shackles before the jury.

16

After the charge conference, Munn became very upset and slammed the holding cell door, causing the courtroom deputy to shackle him. Munn was then brought back into the courtroom, and the prosecutor recommended that Munn remain shackled based on Munn's demeanor, which was becoming increasingly agitated, and because the trial was almost over. The trial court agreed, stating:

> [I]t's my job to protect everyone present . . . . [T]he evidence has shown that the defendant shot someone. That's not in dispute . . . . I've been observing the defendant through this trial and I'm very concerned that he's not going to be able to control himself. . . . He can remain in the courtroom shackled, and I will give the jury an instruction in regard to that, or he can just stay in the holding cell while we finish these proceedings.

Munn's trial counsel then walked over to the jury box and stated: "I mean you can kind of see his feet. . . . I just don't want there to be prejudice, this late in the game, with him having shackles on . . . if the jury can see that." However, counsel did not make a specific objection to Munn being shackled.[13] Munn subsequently elected to

---

[13] At the motion for new trial hearing, trial counsel explained, "I walked over . . . to the jury box . . . to make sure that [the jury] wouldn't have the view [of the shackles]. And I felt like I was comfortable that they didn't, which is why I kind of dropped it."

remain in the courtroom, and the trial court instructed the jury in the final charge not to consider the use of any restraints when assessing guilt or innocence.

Because trial counsel did not make a specific objection at trial, this issue is not preserved for review, and this enumeration of error fails. See *Whatley v. State*, 270 Ga. 296, 302 (14) (509 SE2d 45) (1998) ("A party cannot during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later." (citation and punctuation omitted)).

5. Munn asserts that it was error for the trial court to admit the recording of the responding officer's body camera video into evidence over objection because the video contained witness statements (specifically from Quantel Williams and McGee) telling Deputy Long that the shooter shot Chambers for no reason — which, he argues, violated his right to confrontation guaranteed by the Confrontation Clause and was inadmissible hearsay.

(a) The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right

18

. . . to be confronted with the witnesses against him," U.S. Const. Amend. VI, and "prohibits the admission of out-of-court testimonial statements made by a declarant who is unavailable for cross-examination." *Stafford v. State*, 312 Ga. 811, 824 (5) (b) (865 SE2d 116) (2021). See also *Crawford v. Washington*, 541 U.S. 36, 68 (V) (C) (124 SCt 1354, 158 LE2d 177) (2004). A statement is testimonial where "its primary purpose [is] to establish evidence that could be used in a future prosecution." *Stafford*, 312 Ga. at 824 (5) (b) (citation and punctuation omitted).

Here, Deputy Long arrived at the scene approximately ten minutes after the shooting occurred and before the ambulance had arrived. As Deputy Long was attempting to secure the scene and put up crime scene tape, he was asking people to get out of the way when several onlookers, including Williams and McGee, made unsolicited comments directed to the police about what had just happened, including that "he shot him for no reason" and "he did that s**t for no reason." Even if these statements were considered testimonial, both Williams and McGee testified at trial and were subject to cross-

19

examination, so the admission of their statements does not violate the Confrontation Clause. See *Cornell v. State*, 349 Ga. App. 883, 885 (2) (827 SE2d 63) (2019) ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." (citation and punctuation omitted)).

(b) Because we have determined that the admission of the statements on Deputy Long's body camera footage do not violate the Confrontation Clause, "normal rules regarding the admission of hearsay apply." *McCord v. State*, 305 Ga. 318, 322 (2) (a) (825 SE2d 122) (2019) (citation and punctuation omitted). A statement that would otherwise be excluded as hearsay may be admissible as an excited utterance, where the statement "relat[es] to a startling event . . . [and is] made while the declarant was under the stress of excitement caused by the event." OCGA § 24-8-803 (2).

> We have explained that the excited utterance need not be made contemporaneously with the startling event. Rather, the court should consider the totality of the circumstances in determining whether the statement was made while the declarant was still under the stress or

20

excitement that the startling event caused.

*Blackmon v. State*, 306 Ga. 90, 94 (2) (829 SE2d 75) (2019) (citations, punctuation and footnote omitted).

Here, the video recording shows that the witnesses were screaming and crying as they made their unsolicited statements; the statements were made approximately ten minutes after the shooting, while Chambers was still on the scene bleeding to death; and the witnesses were still under the stress of the shooting. See *McCord*, 305 Ga. at 324 (2) (a) (ii) (statements were excited utterances where witness was "emotionally traumatized" shortly after discovering the victim's body and statements were "blurted-out" (punctuation omitted)); *Varner v. State*, 306 Ga. 726, 732 (2) (b) (ii) (832 SE2d 792) (2019) (witness statements on police recording were excited utterances because "stress and excitement caused by the shooting had not yet dissipated" when "police officers responded just minutes after the shooting, and [the victim] was still bleeding profusely as he waited for an ambulance"). The trial court did not abuse its discretion in admitting these statements as excited

21

utterances.

6. Munn next asserts that the trial court erred in admitting into evidence, over objection, the recording of phone calls made at the jail by Munn to Brooks in which Munn said something to the effect that he had killed someone before.

Munn argues that this statement was unduly prejudicial and should have been excluded under OCGA § 24-4-403, because there was no other evidence of any prior killing. OCGA § 24-4-403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." However, "[w]e need not decide whether [the] statement was erroneously admitted, because any error was harmless." *Bannister v. State*, 306 Ga. 289, 301 (5) (b) (830 SE2d 79) (2019).

> The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so.

*Rodrigues v. State*, 306 Ga. 867, 871 (2) (834 SE2d 59) (2019)

22

(citations and punctuation omitted). Here, as the trial court explained in its ruling on Munn's motion for new trial, the calls were largely hard to understand, and this statement comprised a small part of the State's overall mountain of evidence against Munn — including multiple eyewitnesses to the shooting and Munn's own admission to the police that he shot an unarmed and unthreatening Chambers for no reason. Because the evidence against Munn was overwhelming, any error in admitting the statement that he had committed another murder was harmless, and this enumeration lacks merit. See *Jackson v. State*, 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019) ("Although the evidence of the 2005 shooting should not have been admitted, that error was harmless in light of the array of other strong evidence demonstrating Appellant's guilt.").

7. Munn contends that the trial court erred in denying his *Jackson-Denno* motion to suppress his first custodial interview with Investigator Hayes because the statements in his first interview were involuntary due to his intoxication, as evidenced by his slurred speech, his lack of coherence, and Investigator Hayes's ultimate

23

decision to stop the first interview to allow Munn to sober up. We disagree.

> In deciding the admissibility of a statement during a *Jackson-Denno* hearing, the trial court must consider the totality of the circumstances and must determine the admissibility of the statement under the preponderance of the evidence standard. Unless the factual and credibility findings of the trial court are clearly erroneous, the trial court's decision on admissibility will be upheld on appeal.

*Jones v. State*, 285 Ga. 328, 329 (2) (676 SE2d 225) (2009) (citation and punctuation omitted). Statements are not automatically rendered inadmissible based merely on intoxication at the time the statements are made. See id.

Investigator Hayes explained that, during the first interview, Munn was answering questions appropriately and that, although he was intoxicated, it appeared that his statements were the product of free will. Investigator Hayes ended the first interview because, while Munn was not "completely inebriated," Investigator Hayes wanted Munn to have a "shot at [the interview] sober as opposed to that state of mind that alcohol sometimes diminishes a little bit of

24

your ability to think different ways." The trial court determined that the statements in the first interview were freely and voluntarily given because Munn was able to understand his *Miranda* rights and explain the meaning of the first two *Miranda* rights when questioned by Investigator Hayes and before signing the *Miranda* waiver; Munn made no incriminating statements but rather tried to exonerate himself by denying involvement in the shooting; Munn questioned Investigator Hayes as to how there were eight holes in Chambers and only five shots; Munn formulated an alibi; and Munn was awake and able to recount where he had been on the day Chambers was shot. These findings are amply supported by the record, and overall, "[t]he evidence was sufficient to establish that [Munn's] statement[s] w[ere] a product of rational intellect and free will, albeit that [Munn] was intoxicated at the time his statement[s] w[ere] given," and the trial court did not err in admitting the statements. *Fowler*, 246 Ga. at 258 (3). See also *Lewis v. State*, 298 Ga. 889, 891 (2) (785 SE2d 520) (2016) (concluding that "the trial judge was authorized to find that [the defendant] was rational and

coherent and that his statements were given knowingly and voluntarily" where defendant, who was high on methamphetamine, "indicated that he understood the waiver of rights form when he signed it; . . . knew that the police were investigating [the victim's] death; . . . consented to the interview and knew what he was talking about during the interview . . . [and the] police decided to terminate" the first interview to allow the defendant to get some sleep); *Jones*, 285 Ga. at 329 (2) (trial judge was authorized to find the statements were voluntary even though the defendant was intoxicated when he made them).

8. Finally, Munn contends that he received ineffective assistance of counsel in several ways. His claims are without merit.

To establish ineffective assistance of counsel, Munn must demonstrate both that trial counsel performed deficiently and that the deficient performance resulted in prejudice. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Vivian v. State*, 312 Ga. 268, 272 (2) (862 SE2d 138) (2021).

To show deficient performance, [Munn] must

26

demonstrate that his counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. To show resulting prejudice, [Munn] must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The combined effect of counsel's unprofessional errors must be considered in assessing whether the requisite prejudice has been shown.

*Fisher v. State*, 299 Ga. 478, 483 (2) (788 SE2d 757) (2016) (citation and punctuation omitted). If Munn "fails to establish either prong of the *Strickland* test, we need not examine the other." *Vivian*, 312 Ga. at 272-73 (2).

(a) Munn first claims that his trial counsel was ineffective by failing to file a written request to charge the jury on the defense of justification. This argument fails.

Assuming, without deciding, that trial counsel's failure to request a justification charge was deficient, Munn "was not prejudiced unless there is a reasonable probability that, absent counsel's alleged error in failing to . . . request that charge, the jury would have reached a [different] verdict." *Blackwell v. State*, 302 Ga.

820, 827 (3) (809 SE2d 727) (2018). However, "[b]ecause we have concluded that [Munn] has failed to establish prejudice under the plain-error standard, he also cannot establish prejudice to support his ineffective assistance of counsel claim" on this ground. *Dunn v. State*, 312 Ga. 471, 479 (2) (b) n. 8 (863 SE2d 159) (2021).

(b) Munn further contends that his trial counsel was ineffective in failing to request a mistrial after the trial court ordered that Munn remain shackled in front of the jury.

"[N]o person should be tried while shackled . . . except as a last resort." *Illinois v. Allen*, 397 U.S. 337, 344 (I) (90 SCt 1057, 25 LE2d 353) (1970). But the court has the discretion to resort to shackling, under some circumstances, where "an essential state interest [is] furthered . . . [and where] less restrictive, less prejudicial methods of restraint were considered." *Hill v. State*, 308 Ga. 638, 644 (2) (a) (842 SE2d 853) (2020) (citations and punctuation omitted). As the trial court explained in denying Munn's claim that his due process rights were violated by his shackling at trial: Munn weighed approximately 270 pounds and was over six feet tall; he was not

28

seated at the table closest to the jury; there was concern that "what had previously happened [i.e., Munn's sudden loss of temper when Chambers asked him to slow down] could be repeated in some fashion"; Munn's "temper was simmering under the surface" throughout the trial despite his apology to the court after he slammed the holding cell door; and Munn had a previous conviction for aggravated assault against his own mother. Moreover, there was no evidence that the shackling would impair Munn's ability to confer with his counsel. The trial court further determined that there was no evidence that the jury could see Munn's shackles under the table because his hands could be kept below the table and his waist was hidden by the table and others sitting between him and the jury. And the configuration of the courtroom as described in the record supports this finding. Thus, the trial court did not abuse "its discretion in ordering that the defendant be restrained as a preventative security measure." *Kitchen v. State*, 263 Ga. 629, 629-30 (1) (436 SE2d 645) (1993). Compare *Hill*, 308 Ga. at 645-46 (2) (a) (trial court abused its discretion by requiring defendant to be visibly

shackled where defendant was acting pro se and was shackled throughout entire trial and where trial court based its decision on hearsay and failed to make "individualized findings on the record in support of [the shackles]"). Because the trial court did not abuse its discretion when it ordered Munn to be shackled, "trial counsel cannot be ineffective for failing to make a meritless motion." *Cox*, 306 Ga. at 741 (2) (b) (trial counsel not ineffective for failing to move for mistrial where "mistrial was not mandated" (citation and punctuation omitted)).[14]

*Judgment affirmed. All the Justices concur.*

---

[14] Munn does not argue that the errors we assume for purposes of analysis in this opinion, though individually harmless, nevertheless cumulatively resulted in harm, and we discern no apparent cumulative prejudice on this record. See *State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020) ("[A] defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").

Decided May 17, 2022.

Murder. Douglas Superior Court. Before Judge Emerson.

*James K. Luttrell*, for appellant.

*Dalia Racine, District Attorney, Aimee F. Sobhani, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.