314 Ga. 759
FINAL COPY

S22A0770. BARBER v. THE STATE.

ELLINGTON, Justice.

Appellant Rashad Barber appeals his convictions for malice murder and other crimes arising out of the June 13, 2014 shooting death of Darius Bottoms.[1] On appeal, Barber contends that the

---

[1] On February 10, 2015, a Fulton County grand jury returned an indictment charging Rashad Barber and co-defendants David Wallace and Ryan Bowdery with ten counts stemming from the shooting death of Bottoms, as well as for crimes against three other victims: (1) participation in criminal street gang activity; (2) malice murder of Bottoms; (3) felony murder of Bottoms predicated on aggravated assault with a deadly weapon; (4) felony murder of Bottoms predicated on criminal damage to property in the first degree; (5) felony murder of Bottoms predicated on participation in criminal street gang activity; (6) aggravated assault of Bottoms with a deadly weapon; (7) aggravated assault of Jared Robinson with a deadly weapon; (8) criminal damage to property in the first degree; (9) criminal damage to property in the second degree; and (10) possession of a firearm during the commission of a felony. Barber was tried jointly with Wallace and Bowdery in December 2017, and the jury found Barber guilty on Counts 1 through 10. After a sentencing hearing held on December 21, 2017, the trial court entered judgment on January 4, 2018, and sentenced Barber to serve life in prison for malice murder (Count 2); twenty years to serve in prison consecutive to Count 2 for the aggravated assault of Jared Robinson (Count 7); five years to serve in prison consecutive to Count 7 for criminal damage to property in the second degree (Count 9); and five years to serve in prison concurrent with Count 9 for possession of a firearm during the commission of a felony (Count 10). The judgment stated that participation in criminal street gang activity (Count 1), felony murder counts (Counts 3 through 5), aggravated assault of Bottoms with

evidence was insufficient to sustain his conviction for murder because the only evidence inculpating him in this crime was presented through the testimony of an alleged accomplice, that the trial judge erred by failing to recuse himself after making statements revealing a personal bias, and that the trial court erred when it resentenced him on the charges of participation in criminal street gang activity and possession of a firearm. For the reasons that follow, we affirm Barber's convictions and sentences.

Viewed in the light most favorable to the verdicts, the evidence shows that in the days leading up to the June 13, 2014 shooting that resulted in Bottoms's death, two rival gangs were involved in an ongoing dispute related, at least in part, to the recent decision by

a deadly weapon (Count 6), and criminal damage to property in the first degree (Count 8) were vacated by operation of law, although Count 1 was not vacated by operation of law, and Counts 6 and 8 actually merged with Count 2. Barber's trial counsel filed a motion for a new trial on January 24, 2018, and new counsel filed an amended motion for a new trial on March 17, 2020. After a hearing on September 28, 2021, the trial court resentenced Barber, imposing a sentence of twenty years to serve in prison on Count 1, concurrent with Count 2, and changing the five-year sentence on Count 10 to run consecutively to Count 9. The trial court denied Barber's motion for a new trial on October 20, 2021, and Barber filed a timely notice of appeal. This appeal was docketed to the April 2022 term and submitted for a decision on the briefs.

one gang member, Kareasha Washington, to leave the "Billy Bad Asses Bloods" gang (the "Billy" gang) and join the "Neighborhood Bloods/Rolling Twenties Blood" gang (the "NHB" gang). Washington left the Billy gang because some members thought she was involved in the death of another member of the Billy gang. Barber and his co-defendants, David Wallace and Ryan Bowdery, were members of the NHB gang.

Pertinent to this appeal, the evidence showed that on June 6, 2014, a blue Acura was stolen four blocks from the area where Bottoms was shot. Although it was not established who stole the blue Acura, Washington admitted she and Wallace drove around in the stolen Acura for several days after it was taken. On June 9, 2014, a 2014 beige four-door Hyundai Elantra belonging to James Terrell, a friend of Barber's stepfather, Jasen Williams, was stolen from in front of Williams's home, where Barber lived until just a few weeks before Terrell's Hyundai was stolen. Several hours later, shots were fired into a boarding house located on Sells Avenue, an area known to be part of the territory of the Billy gang. Shots were fired at the

3

same boarding house two nights later, on June 12, 2014, at 4:20 a.m. Police, on this occasion, were able to recover three 9mm shell casings from outside the boarding house.

On June 12, 2014, at about 6:20 p.m., Barber, Washington, Wallace, and a fourth person drove in the stolen Acura to the Arrowhead Pawn Shop in Clayton County. Video surveillance from the pawn shop shows Barber, Washington, and Wallace inside the pawn shop looking at guns while another shopper, Abert Moss, and her friend, Nashunta Thomas, did the same. Barber is seen on the video wearing jeans and a white tank top. The video also shows Barber, Washington, and Wallace leaving the pawn shop, followed shortly thereafter by Thomas and Moss, who had purchased a 9mm Jimenez handgun. As Thomas sat in a car in the pawn shop parking lot with the gun Moss had just purchased, Wallace stuck a different gun in Thomas's face and demanded the newly purchased 9mm handgun. Wallace then ran back to the blue Acura and fled with Barber, Washington, and the other person.

Approximately five hours later, at 11:30 p.m. on June 12, 2014,

4

Barber's stepfather, Williams, was attacked outside his home and shot multiple times. Selena Barber, Rashad Barber's mother, accompanied Williams to the hospital, but she did not tell Barber about the shooting because she was afraid of what Barber might do. She and Williams reported the shooting to the police, however, believing that it might be related to Barber's dispute with the Billy gang.

Within hours of Williams's shooting, Barber learned that Williams had been shot, and he, Wallace, Washington, and Bowdery got together. The four drove around in the blue Acura with Washington in the driver's seat, Wallace in the front passenger seat, and Bowdery and Barber, who Washington stated was carrying both a revolver and a 9mm handgun, sitting in the rear seats. According to Washington, she then made plans to meet with a friend who was a member of the Billy gang near Legacy Drive and Sells Avenue in Fulton County. Washington, Barber, Wallace, and Bowdery arrived early at the agreed-upon location, so Barber and Bowdery got out of the car. Washington and Wallace remained in the car until, a few

minutes later, she heard Barber yell, "There go them Billies," and she saw Barber and Bowdery run around the corner at the intersection of Legacy Drive and Sells Avenue. Washington then heard several gunshots, causing her to get out of the car and run away. Barber and Bowdery ran back to the stolen Acura, and Wallace, who was, by now, in the driver's seat, followed Washington and told her to get in the car. As they drove away, Washington heard Barber keep saying, "That was the Billy, that was the Billy who shot up my Mama's house."

Theda Hall, who lived in a second-floor apartment near the corner of Legacy Drive and Sells Avenue, stepped onto her balcony in the early morning hours of June 13, 2014, and saw whom she described as two males sitting in the front seat of a vehicle parked near the corner of Legacy Drive and Sells Avenue. She saw another male standing outside the vehicle on the sidewalk, and a fourth male standing outside the vehicle in the shadows. According to Hall, the male standing near the vehicle, the one she referred to as the "shooter," had a gun and was wearing jeans and a white shirt with

thin straps across the shoulders. She described the shooter as being about 25-30 years old and approximately six feet tall with a muscular build, medium to medium-dark brown skin, "a little short haircut," and possibly a mark or tattoo on his neck. Hall saw the shooter walk up to the corner of Legacy Drive and Sells Avenue while the car pulled forward, then heard some yelling, followed by several gunshots. Hall stated the person standing in the shadows also had a gun and was talking to the shooter as he stood in the intersection.

Bottoms and Jared Robinson had been visiting a friend in an apartment near the intersection of Legacy Drive and Sells Avenue in the early morning hours of June 13, 2014. They had driven to the friend's apartment in Bottoms's new silver four-door Hyundai Elantra, a gift to Bottoms from his grandfather. At approximately 4:00 a.m. on June 13, Bottoms and Robinson left the friend's apartment and walked to Bottoms's vehicle, which they had parked down the hill from the intersection of Legacy Drive and Sells Avenue. Robinson told police that as he and Bottoms pulled out of

the parking space onto Legacy Drive facing toward the top of the hill, they saw a male coming down the hill toward them, yelling, and pointing aggressively. The person coming toward them then started shooting at them at a rapid pace, ultimately striking Bottoms through the windshield with a single gunshot from a 9mm handgun. Bottoms died at the scene from a gunshot wound to the head.

Robinson was able to get away but noticed from a distance that someone was shooting from near the stop sign at the top of Legacy Drive. Seventeen shell casings were ultimately recovered from the crime scene; eleven 9mm Luger shell casings were discovered near the intersection of Legacy Drive and Sells Avenue, and another six shell casings from a different 9mm handgun were recovered from farther down the hill.

During questioning by police, Washington admitted that she was driving the stolen Acura on the night Bottoms was killed, and she identified Barber and Bowdery as the males who shot at Bottoms and Robinson. She also identified Wallace as the male who stayed at the car during the shooting and drove the Acura as all four

fled after the shooting.

Video surveillance showed a car matching the stolen Acura's description speeding on Sells Avenue moments after the shooting. Cell phone evidence from Washington's and Wallace's phones indicated they were together on June 13, 2014, in the area near Legacy Drive between 3:42 a.m. and 3:59 a.m., just before the shooting occurred, and in the Cleveland Avenue area of Atlanta shortly after the shooting, and that Washington called Barber at 7:00 the morning of the shooting. Cell phone records from phones linked to Washington, Barber, and Wallace also showed a significant amount of communication between them leading up to the robbery in the pawn shop parking lot and the shooting of Bottoms and between Washington, Barber, Wallace, and Bowdery throughout the day of the shooting.

A week after the shooting, police arrested Wallace and another person in the stolen blue Acura. Police recovered from a backpack found inside the Acura a 9mm Jimenez handgun that was determined by a ballistics expert to be the gun stolen from Moss at

the pawn shop and the same gun that fired six of the seventeen shell casings found at the scene where Bottoms was killed. A second Jimenez 9mm handgun fired the other eleven shell casings recovered at the scene of Bottoms's murder. This same gun, which was never recovered by police, had also been used at the shooting on June 12, 2014, at the Sells Avenue boarding house. In July 2014, Bowdery posted a photo on social media showing him and Barber holding black guns with the notation, "Shooter featuring Slugger, we loaded." "Shooter" was Bowdery's street name, and "Slug" was Barber's street name. A gun in the photo was identified as a Bryco Jennings Nine or Jimenez JA-Nine, which was described at trial as the same type of gun as one of the guns used in the shooting on June 13, 2014.

1. Barber contends that the evidence in support of his conviction for the murder of Bottoms[2] was insufficient under Georgia

---

[2] Barber does not challenge his convictions for participation in criminal street gang activity, aggravated assault, criminal damage to property, and possession of a firearm during the commission of a felony, and we no longer review sua sponte the sufficiency of the evidence, except with respect to murder

law because the testimony of Washington was not sufficiently corroborated, as required by OCGA § 24-14-8.[3] We disagree.

OCGA § 24-14-8 provides, in pertinent part, that, while "[t]he testimony of a single witness is generally sufficient to establish a fact," in felony cases where the only witness is an accomplice to the crimes, the witness's testimony alone will be insufficient to support a defendant's convictions. Thus, "[w]hen the only witness is an accomplice, corroborating evidence is required to support a guilty verdict." *Raines v. State*, 304 Ga. 582, 587 (2) (a) (820 SE2d 679) (2018).

> Although OCGA § 24-14-8 provides that corroboration is required[,] . . . only slight evidence of corroboration is required. The necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime. The evidence need not be sufficient in and of itself to warrant a conviction, so long

convictions resulting in the death penalty. See *Davenport v. State*, 309 Ga. 385, 398-399 (4) (b) (846 SE2d 83) (2020).

[3] Barber frames this argument as a sufficiency of the evidence issue under *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). But the requirement that an accomplice's testimony be corroborated is a requirement only of Georgia evidentiary law. Accordingly, to the extent that Barber seeks to state a *Jackson* claim for failure of corroboration, that claim fails because *Jackson* requires no such thing.

11

as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt. The sufficiency of the corroboration is a matter for the jury to decide.

(Citations and punctuation omitted.) Id. at 588 (2) (a). "[T]he independent evidence must corroborate both the identity of the defendant and the fact of his participation in the crime." (Citation and punctuation omitted.) *Pittman v. State*, 300 Ga. 894, 896 (1) (799 SE2d 215) (2017) (setting out requirement for corroboration of accomplice testimony under former OCGA § 24-4-8). See also *Ramirez v. State*, 294 Ga. 440, 442 n.5 (754 SE2d 325) (2014) (noting that the provisions of former OCGA § 24-4-8 were carried forward into the current Evidence Code as OCGA § 24-14-8).

Even assuming the jury found Washington to be an accomplice, other evidence that did not come from Washington, including the pawn shop video, Hall's testimony, cell phone record evidence, and evidence of Barber's motive for shooting in retaliation for the gang-related shooting of his stepfather, corroborated Washington's testimony.

12

According to Washington, Barber stepped out of the stolen Acura and, while standing near the intersection of Legacy Drive and Sells Avenue, shouted, "There go them Billies." Barber then ran around the corner and started shooting at Bottoms and Robinson. She testified that immediately after the shooting, Barber explained that he shot Bottoms and Robinson because they were the ones who "shot up" his mother's house. Hall described seeing four men in and around a car at the same intersection on the morning of June 13, 2014, then heard yelling, followed by multiple gunshots. She described the shooter as wearing clothing similar to what Barber was seen wearing during the robbery at the pawn shop just hours before the shooting.

Hall's description of the shooter's clothing, location, and physical characteristics was consistent with Washington's trial testimony and statements to police about what Barber was wearing and doing at the time of the shootings. Hall's description of the shooter's clothing was also consistent with video evidence of the clothing Barber was wearing during the robbery at the pawn shop

that took place just hours before Bottoms was killed. The jury could decide for itself at trial how closely the description of the man described by Hall resembled Barber. See *Johnson v. State*, 288 Ga. 803, 805-806 (2) (708 SE2d 331) (2011) (Witness's physical description of shooter and description of shooter's clothing, although not the strongest corroboration, was sufficient to corroborate accomplice's testimony identifying the defendant as the shooter.).

In addition, evidence from the cell phone records of Washington, Barber, Wallace, and Bowdery indicated that Barber was associated with each of them, that they were communicating leading up to the time of the shooting, and that Washington called Barber at 7:00 the morning of the shooting. The jury was also authorized to determine from the pawn shop video and Bowdery's social media post that hours before the shooting and after the shooting Barber was in possession of one of the 9mm guns used to shoot Bottoms.

This evidence provided sufficient corroboration of

Washington's testimony.[4] See *Poole v. State*, 312 Ga. 515, 522 (863 SE2d 93) (2021) (Physical evidence collected at scene, witness's description of events, postings to defendant's social media accounts, and cell phone data showing defendant and co-defendants communicating during time span closely coinciding with the shooting and in the area near the crime scene when the crime occurred was sufficient to corroborate accomplice testimony.); *Sheard v. State*, 300 Ga. 117, 119 (1) (793 SE2d 386) (2016) (Evidence that defendant was observed discussing plans to rob the victim, a person matching the defendant's description was seen in the area at the time of the crimes, the defendant was in possession of a large amount of cash after the crimes, and the defendant had a motive to commit the crimes was sufficient to corroborate the testimony of his alleged accomplice under former OCGA § 24-4-8.); *Crawford v. State*, 294 Ga. 898, 901-902 (1) (757 SE2d 102) (2014)

---

[4] Because Barber did not claim any error related to the court's jury instruction on corroboration, the only question decided in this appeal is whether a properly instructed jury could have found that Washington's testimony was sufficiently corroborated.

(Phone records demonstrating communications between co-defendants were sufficient to corroborate accomplice's testimony inculpating the defendant.); *Threatt v. State*, 293 Ga. 549, 551-552 (1) (748 SE2d 400) (2013) (Defendant's false statements to police and communications between co-defendants both before and after the crimes corroborated accomplice's testimony.).

2. Barber contends the trial judge was required to sua sponte recuse himself after making statements Barber alleges called into question the judge's impartiality. Barber did not move to recuse the trial judge during trial, however, and there is no evidence in the record indicating that Barber followed the procedures set out in Uniform Superior Court Rule 25.1 for moving to recuse a judge.[5]

---

[5] Uniform Superior Court Rule 25.1 provides, in pertinent part:

All motions to recuse or disqualify a judge presiding in a particular case or proceeding shall be timely filed in writing and all evidence thereon shall be presented by accompanying affidavit(s) which shall fully assert the facts upon which the motion is founded. Filing and presentation to the judge shall be not later than five (5) days after the affiant first learned of the alleged grounds for disqualification, and not later than ten (10) days prior to the hearing or trial which is the subject of recusal or disqualification, unless good cause be shown for failure to meet such time requirements.

Accordingly, this enumeration of error has not been preserved for appeal. See *Lopez v. State*, 310 Ga. 529, 537 (6) (852 SE2d 547) (2020).

3. Barber also asserts the trial court erred when it resentenced him on his convictions for participation in criminal street gang activity and possession of a firearm during the commission of a crime. After reviewing the record, we discern no error in Barber's sentences.

As stated, Barber was found guilty, in pertinent part, of participation in criminal street gang activity (Count 1), malice murder (Count 2), and felony murder predicated on the underlying felony of participation in criminal street gang activity (Count 5). With regard to Barber's conviction on Count 1 for participation in gang activity, the trial court, in its initial sentencing order, concluded that this conviction was vacated by operation of law, and therefore, imposed no sentence for Count 1. Barber, however, should have been sentenced on Count 1 because his conviction on Count 5 for felony murder predicated on the underlying felony of

17

participation in gang activity was vacated by operation of law in light of his conviction on Count 2 for malice murder. See *Malcolm v. State*, 263 Ga. 369, 372 (5) (434 SE2d 479) (1993). This left, as a matter of law, no felony murder charge in which to merge Barber's conviction on Count 1 and nothing to require the vacation of his conviction on Count 1. See *Carter v. State*, 299 Ga. 1, 2 (2) (785 SE2d 532) (2016). Accordingly, Barber should have been sentenced for his participation in gang activity conviction at his original sentencing hearing. Similarly, the trial court originally ordered that Barber's sentence on Count 10 for possession of a firearm during the commission of a felony run concurrent with his other sentences, despite mandatory language in OCGA § 16-11-106 (b) that an individual convicted of possession of a firearm during the commission of a felony "shall be punished by confinement for a period of five years," and that this sentence shall "run consecutively to any other sentence which the person has received."

"A trial judge has the authority to correct a void sentence at any time, and a sentence is void if the court imposes punishment

that the law does not allow." (Citations and punctuation omitted.) *Parrott v. State*, 312 Ga. 580, 582 (3) (864 SE2d 80) (2021). Because the trial court's original sentencing order did not include the sentences required by law for Barber's convictions on Counts 1 and 10 of the indictment, the trial court's subsequent correction of those void sentences was not only authorized but was required.[6]

*Judgment affirmed. All the Justices concur.*

---

[6] We reject Barber's contention that the trial court was without authority to correct his sentence for Count 1, participation in criminal street gang activity, on the theory that the State invited the error by incorrectly informing the trial court during sentencing that Count 1 merged into the felony murder count predicated on the felony charge of participation in criminal street gang activity. Even assuming the State's conduct induced the trial court's failure to sentence Barber on Count 1, the sentence imposed by the court was less than the sentence required by OCGA § 16-15-4 (m) and, therefore, was void, and its illegality is not an issue that can be waived by either party. See *Curtis v. State*, 275 Ga. 576, 577-578 (1) (571 SE2d 376) (2002) (A challenge to the legality of a sentence the law does not allow cannot be waived because a "judgment which is void for any cause is a mere nullity and it may be so held in any court where it becomes material to the interest of the parties to consider it." (citation and punctuation omitted)), overruled on other grounds, *Williams v. State*, 287 Ga. 192 (695 SE2d 244) (2010); *Zipperer v. State*, 299 Ga. App. 792, 794 (2) (683 SE2d 865) (2009) ("[A] defendant's acquiescence to an illegal sentence . . . cannot render an otherwise illegal sentence valid through waiver[,]" because "a void sentence in law amounts to no sentence at all." (citations and punctuation omitted)).

Decided October 4, 2022.

Murder. Fulton Superior Court. Before Judge Krause.

*Star Law, F. Michael Starosto*, for appellant.

*Fani T. Willis, District Attorney, Michael S. Carlson, Lyndsey H. Rudder, Kevin C. Armstrong, Elizabeth Rosenwasser, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.