NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 15, 2024

S24A0422. WALLACE v. THE STATE.

BOGGS, Chief Justice.

Appellant David Dajuanta Wallace challenges his convictions for felony murder and a firearm offense in connection with the shooting death of Darius Bottoms. Appellant contends that the evidence was insufficient; that requiring Appellant to wear a leg iron and prison clothing at trial violated his due process rights; and that he was denied effective assistance of counsel. We conclude that the evidence was sufficient to support Appellant's convictions as a matter of Georgia statutory law under OCGA § 24-14-8 as well as under federal constitutional law. Statutorily, even assuming that the witness to which Appellant points was an accomplice, the witness's testimony was corroborated by other evidence, which satisfied the statute. Constitutionally, the evidence presented at

trial and summarized below authorized the jury to find that Appellant was a party to the crimes of felony murder and possession of a firearm during the commission of a felony, instead of being merely an accessory after the fact. Additionally, even assuming that the shackling violated his due process rights, any error was harmless beyond a reasonable doubt in light of the trial court's finding that the jury could not see the leg iron, the strategic way in which Appellant used the leg iron to his advantage at trial, the strong evidence of Appellant's guilt, and the jury instructions that the trial court gave about a defendant's presumed innocence. Finally, trial counsel was not ineffective because, for each of Appellant's arguments, he has failed to show either deficiency or prejudice. Accordingly, we affirm.[1]

---

[1] The crimes occurred on June 13, 2014. On February 10, 2015, a Fulton County grand jury jointly indicted Appellant, Rashad Barber, and Ryan Bowdery for various crimes associated with Bottoms's death. The grand jury indicted Appellant for participation in criminal street gang activity, felony murder based on participation in criminal street gang activity, two counts of possession of a firearm during the commission of a felony, two counts of hindering the apprehension of a criminal, two counts of theft by receiving stolen property, contributing to the delinquency of a minor, and obstruction of a law enforcement officer. Appellant pled guilty to some of the charges and

1. The evidence presented at trial showed the following.[2] Appellant was with Rashad Barber, Kareasha Washington, and another person[3] when Bottoms was fatally shot on June 13, 2014;

went to trial on others. The trial court nolle prossed one count of theft by receiving stolen property. At a joint trial with Barber and Bowdery from December 4 to 21, 2017, the jury found Appellant guilty of participation in criminal street gang activity, felony murder, and one count of possession of a firearm during the commission of a felony. The jury also found Barber and Bowdery guilty of all counts. We recently affirmed Barber's convictions, see *Barber v. State*, 314 Ga. 759, 766 (879 SE2d 428) (2022), and Bowdery's appeal is pending. See Case No. S25A0077. The trial court sentenced Appellant to serve life in prison with the possibility of parole for felony murder and a consecutive term of five years for the weapons charge. Moreover, although the trial court orally stated during sentencing that the participation in criminal gang activity count merged into felony murder, the trial court's signed sentencing sheet described the participation in criminal street gang activity count as being vacated by operation of law. The sentencing sheet signed by the judge controls here, see *Bell v. State*, 294 Ga. 5, 8-9 (749 SE2d 672) (2013), but it incorrectly described the disposition of that count; the underlying felony merged into felony murder. See *Terrell v. State*, 313 Ga. 120, 132 (868 SE2d 764) (2022). On January 5, 2018, Appellant filed a motion for new trial, which he amended with new counsel on January 27, 2023. After an evidentiary hearing on June 1, 2023, the trial court entered an order denying the motion on July 12, 2023. Appellant filed a timely notice of appeal, and the case was docketed in this Court to the April 2024 term and submitted for a decision on the briefs.

[2] Because we consider below whether any trial court error was harmless and whether Appellant has shown *Strickland* prejudice, we review the evidence in detail and weigh it as reasonable jurors would have, instead of viewing the evidence in the light most favorable to the verdicts. See *Renfro v. State*, 313 Ga. 608, 613 (872 SE2d 283) (2022) (constitutional harmless error); *Tavarez v. State*, 319 Ga. 480, 481 n.2 (904 SE2d 366) (2024) (*Strickland* prejudice).

[3] In *Barber*, where we viewed the evidence in the light most favorable to the verdicts, we recounted evidence identifying as Bowdery the other person

after the shooting, Appellant drove the group away from the scene. Detective Tyrone Dennis of the Atlanta Police Department, who testified for the State as a gang expert and whose testimony we recount further below, told the jury that police were aware in 2014 of an ongoing feud between the "Rollin 20s Bloods" gang ("Rollin 20s" gang) and the "Billy Bad Ass Bloods" gang ("Billy" gang) because of "several shootings that were related."[4] Washington, who was familiar with the events surrounding Bottoms's death and whose testimony we also describe in more detail below, recalled that at the time of Bottoms's shooting the Rollin 20s and Billy gangs were in "a war." Bottoms was not in a gang.

A week before the shooting, on June 6, 2014, Bridget Bailey went to work at an elementary school. Bailey testified that she parked her blue Acura TL car in front of the school and that an

---

who participated in the shooting. See 314 Ga. at 760-763. Here, where we weigh the evidence as reasonable jurors would, we account for certain nuances in the evidence, such as Washington's testimony at trial that Bowdery did not participate in the shooting, which contradicted her earlier statements.

[4] Detective Dennis and Kareasha Washington further testified that the Rollin 20s gang was also called the "Neighborhood Bloods" or "NHB" gang, and that the Billy gang was formally called the "9-Trey Bloods."

unknown person stole her Acura later that day. According to Detective Justin Strom of the Atlanta Police Department, a school detective who was assigned to the school, the school was located in Atlanta about two to three blocks away from the intersection of Sells Avenue and Legacy Drive where Bottoms was fatally shot.

James Terrell testified that on June 9, 2014, three days after the Acura was stolen, Terrell went to his friend Jasen Williams's home to spend time there. Jasen Williams was Barber's stepfather. As Terrell prepared to leave and was backing out of the driveway, he realized that he left his phone inside Williams's home, so he went back inside to retrieve it. By the time he returned outside "about a minute" later, his car — a beige, four-door 2013 Hyundai Elantra — had been stolen.

Ebony Ware testified that on June 10, one day after Terrell's Hyundai Elantra was stolen, she was living in a rooming house located on Sells Avenue. While asleep on June 10, she woke up to the sound of "loud voices." Moments later, a bullet grazed her arm. She realized that someone was shooting a gun into the house, so she

"tried to hit the floor and just stay covered[.]"Two days later on June 12, 2014, around 4:00 a.m., more shots were fired into the rooming house. According to Detective Tyrone Dennis, the rooming house was located inside "Billy territory."

Nashunta Thomas testified that on June 12, 2014, during the daytime, she went with her friend Abert Moss to a pawn shop in Clayton County to purchase a firearm. Thomas bought a nine-millimeter firearm and handed the bag containing the firearm to Moss as they got into a truck to leave. While Moss was in the process of getting into the passenger side of the truck, a male who had "tattoos everywhere," including on his neck and face, ran up to them at the truck while carrying a gun, took the nine-millimeter firearm from Moss, and ran away to a "dark blue-ish," "newer" sedan that was waiting for him with the rear passenger-side door open.

Moss testified that she was present with Thomas at the pawn shop and that she was robbed in the parking lot around 6:00 p.m. As Moss and Thomas got into their truck to leave, someone ran up behind the truck on the passenger side where Moss was, pointed a

6

gun at her, and commanded her to give him the gun that she had. After grabbing the gun from her, the person ran back to a "blue car" that contained about four people, and the car drove off. Moss later identified Appellant in a photo lineup as the person who robbed her. She identified Appellant again at trial as the robber.

Later on the same night, following Moss's robbery at the pawn shop, Jasen Williams left the Barber family home to go to the store. Barber was not present that night but had lived at the house until the week before. Williams recalled that he "was kind of weary [sic] about what was going on" in the neighborhood after the theft of Terrell's car a few days before: "[t]his wasn't random because [Williams's home was located] on a dead end street. [He didn't] have a lot of traffic going up and down. So [he] kind of figured somebody had to be in [his] yard or someone had to be hiding behind a tree in the woods somewhere." When Williams returned from the store, he shined his headlights on either side of his house to check for anyone suspicious and then pulled under his carport. "[A]s soon as [Williams got] out of the car," two males ran up to him. One of them pulled a

7

gun and shot Williams three times, but he survived. Selena Barber, Barber's mother, confirmed that Barber was at his aunt's house on the night of June 12, 2014, but that Barber had just moved out of the Barber family home. Selena recalled that even though Barber was gone, his aunt told him later that night about Williams getting shot.

Barber's aunt Stephanie McKneely verified that Barber had moved in with her not long before Williams's shooting. McKneely further testified that she told Barber about Williams's shooting shortly after it occurred. McKneely decided to meet Williams at the hospital, so she asked Barber if he wanted to come, too. He declined.

Kareasha Washington testified about the events surrounding Bottoms's death. She acknowledged that she was involved in his shooting and conceded that, in exchange for her testimony in this case, she had not been charged with Bottoms's murder and may have been able to avoid prosecution in Clayton County for the pawn shop robbery. Washington joined the Billy gang at age 14. In early June 2014, she converted from the Billy gang to the Rollin 20s gang

8

because a member of the Billy gang suspected her of causing another Billy's death. According to Washington, she, Appellant, Ryan Bowdery, and Barber were all members of the Rollin 20s gang.[5] On the week that Bottoms died, Washington had been "joyriding, smoking, [and] riding around" in the stolen blue Acura, "mostly" with Appellant. At the time, she was "going to war" and "beefing with some rival gangs real hard" because the Billy gang was trying to betray her. On June 12, 2014, Washington, Appellant, Barber, and "some . . . boy [who] resembled Bowdery" but that was not Bowdery went with two others in the stolen Acura to a pawn shop in Clayton County. When the group left the pawn shop, Washington drove the Acura, Appellant got into the car with a nine-millimeter firearm, and they left. The group later "rode around" Atlanta and then drove to the intersection of Sells Avenue and Legacy Drive, which was Billy territory, to meet a member of the rival Billy gang

---

[5] In various portions of Washington's and other witness's testimony, witnesses referred to the co-defendants by their nicknames. Barber went by the nickname "Slug"; Bowdery used "Shooter"; and Appellant answered to "DK." For simplicity, we use their legal names.

there.[6] The group had about three or four guns in the car with them. Specifically, Barber had the nine-millimeter that Appellant stole at the pawn shop. When they arrived, everyone got out of the car. Washington denied setting up the meeting with a member of the Billy gang so that the group could kill him. Nevertheless, Barber and the "boy" who Washington claimed was not Bowdery (but that resembled Bowdery) walked up and down the sidewalk until Barber yelled something to the effect of "[T]here go the Billies" or "[T]here goes one of the . . . Billies." Barber and the "boy" went around the corner while Appellant remained near the car. Once Barber and the "boy" went around the corner, Washington could not see them. Washington then heard gunshots and began walking away to a nearby gas station. When the shooting ended, Appellant, Barber, and the "boy" got in the car, and Appellant drove them to Washington's location and told her to get in. As Appellant drove the

---

[6] Washington's testimony conflicted as to why the group went there. At some points, she testified that she called a Billy named "PC" asking for gas money and agreed to meet him at the top of the hill on Legacy Drive. At others, Washington acknowledged she told police in an interview that she went there to meet a Billy named "Ray Lee" for a romantic encounter.

group away in the Acura, Appellant asked Barber, "[W]hat did you do?" Barber answered, "[T]hat was the Billy, that was the Billy who shot up my mama's house." Appellant and Washington became angry when they heard Barber's answer.

Washington also identified Jerry Price III as a friend of hers who was in prison at the time of Bottoms's death and was a member of the Rollin 20s.[7] Washington specified that Price used a cell phone he obtained inside the prison system to call her right after Bottoms was shot. Washington claimed that Price was "just checking on [her]" at 4:00 a.m., that she did not tell Price about the shooting, and that Price was not overseeing the group's actions that night.

Similarly, in Washington's recorded interview with law enforcement, portions of which were played for the jury at trial, Washington stated that Barber, Bowdery, and Appellant were present when Bottoms was shot and that Barber and Bowdery were the shooters. Washington denied that the group went there for the purpose of killing anyone. She also maintained that Appellant was

---

[7] Witnesses identified Price by the nickname "Flat" or "Splat."

upset when Appellant found out about the shooting.

Jared Robinson, Bottoms's best friend, testified that on the night of June 12, 2014, Robinson and Bottoms spent time together at a friend's apartment near the intersection of Sells Avenue and Legacy Drive. They left together around 4:00 a.m. on July 13, 2014, and got into Bottoms's Hyundai. Robinson and other witnesses familiar with Bottoms testified that at the time of his death, Bottoms drove a silver, four-door 2014 Hyundai Elantra. After Bottoms drove the car out of the parking spot and about halfway up the hill toward the intersection, he stopped. Robinson saw a male "come from the sidewalk to the middle of the street" who began yelling at them with "real anger" and "pointing in an aggressive manner." Bottoms and Robinson asked each other if he recognized the person standing in the street; neither did. Immediately, at least 10 shots rang out. One of the first shots hit Bottoms in the face, killing him. Robinson exited the car and ran. As he fled, he looked back and, based on what he saw, gathered that a single shooter fired all the shots from two positions: first firing from the middle of the

street, and then from the left side of the street.

Theda Hall lived in an apartment near the intersection of Sells Avenue and Legacy Drive in June 2014. Hall testified that during the early morning hours of June 13, 2014, she heard two voices from the street below. She then went out onto her patio and saw a car parked on Legacy Drive with two men in the front seats. She also saw a third man standing on the sidewalk talking to the two men inside the car, and a fourth man in the shadows near the intersection of Sells Avenue and Legacy Drive.[8] As the car with two males inside drove toward the intersection of Sells Avenue and Legacy Drive, she heard gunshots. The car then rolled backward down the hill and crashed.

Police arrested Appellant the next week. Officer Daniel Burnett of the Atlanta Police Department testified that on June 21, 2014, he and other uniformed police officers conducted a routine patrol using a marked police vehicle in an area near the intersection

---

[8] At one point in her testimony, Hall testified that she saw three people outside her apartment, but before she could elaborate, Barber objected. At other points in her testimony, Hall maintained that she saw four people.

13

of Sells Avenue and Legacy Drive. The officers turned into a restaurant parking lot; immediately, a driver and passenger of a blue Acura TL got out of the vehicle, dropped their food, and started running away. Officer Burnett explained that this was "not a normal reaction when police pull into a parking lot." The officers split up to chase and capture the individuals who fled: one of the runners ended up being Appellant. After capturing the fleeing individuals, officers ran the Acura's tag and discovered that it was a stolen vehicle, and they arrested Appellant. Inside the Acura, officers found a handgun later determined to be the firearm stolen from Moss at the pawn shop, two cell phones, a red bandana, and a red bookbag. In post-arrest interviews with law enforcement, Appellant denied being involved in Bottoms's murder.

At trial, Julie Riley of the Georgia Bureau of Investigation testified for the State as an expert in firearm examinations and identifications. According to Riley, the nine-millimeter firearm Appellant stole at the pawn shop was used in Bottoms's shooting. Riley also concluded, based on her analysis of shell casings recovered

14

at the scene, that a second nine-millimeter firearm was used in Bottoms's shooting. That second firearm was also used in the shooting at the Sells Avenue rooming house on June 12, 2014. Detectives David Quinn and Brett Zimbrick of the Atlanta Police Department testified that the fatal shot came from a second firearm, not the one Appellant stole.

Detective Tyrone Dennis testified for the State as an expert in gangs, as mentioned above. As a general matter, Detective Dennis explained that Bloods members used the color red, five-pointed stars, and red tattoos to identify themselves. Furthermore, Detective Dennis explained to the jury that older members of gangs are called "OGs," short for "original gangsters." When asked whether it was possible for an incarcerated OG "to still be controlling the trouble in the streets," Detective Dennis answered, "Most definitely. Most of our criminal street gangs are ran [sic] out of prison" due to prisoners having devices through which they could "send text messages and information to the streets and basically have things done just like if they were on the street." Specifically,

Detective Dennis testified that Price was an "OG" Rollin 20s member who functioned as "the shot caller and . . . the decision-maker," "the CEO." In Detective Dennis's expert opinion, cell phone records associated with Appellant and Washington were consistent with Price directing what happened on the street around the time of Bottoms's murder, because Price's phone communicated frequently with phones belonging to people involved in Bottoms's murder. Additionally, when explaining gang culture to the jury, Detective Dennis emphasized that a gang's turf or territory is "everything" and that gangs commonly retaliate against each other with violence. According to Detective Dennis, Sells Avenue was Billy territory, and the Billy gang commonly clashed with the Rollin 20s gang even though they were both Bloods sects.

The State also presented tattoo and cell-phone evidence to the jury. Investigator Charles Prescott of the Fulton County District Attorney's Office, who oversaw the office's gang unit, testified that he executed a search warrant for Appellant's, Barber's, and Bowdery's tattoos and markings by photographing them. According

16

to Investigator Prescott, Appellant had multiple tattoos, including a chest tattoo that said, "Family First" and "Bloods." Appellant also had a red, five-pointed star tattooed onto his neck. Additionally, Detective Kevin Leonpacher of the Atlanta Police Department testified for the State as an expert in historical cell records analysis. Detective Leonpacher testified that Appellant's phone communicated frequently with Washington's and Barber's phones in the hours leading up to and after Bottoms's death. Detective Leonpacher further specified that "looking at [Washington's] records going through the afternoon of the 13th after the murder of Darius Bottoms, there continue to be communication between [Washington's] phone, Bowdery's phone number, Barber's phone number and [Appellant's] phone number and [Price's] phone number throughout the day going into the night." Finally, location data associated with Appellant's and Washington's phones showed that the phones arrived at the murder scene shortly before Bottoms's death and within one minute of each other.

After the State rested, the trial court read to the jury a joint

17

stipulation by Appellant and the State that before trial, Appellant pled guilty to other charges in the indictment.[9]

2. Appellant contends that the evidence was insufficient in two ways. First, he argues that Washington was an accomplice whose testimony was not corroborated, in violation of OCGA § 24-14-8. Second, he asserts that the evidence was constitutionally insufficient under *Jackson v. Virginia,* 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), because the evidence only authorized the jury to find that Appellant was an accessory after the fact, not an accomplice.

In the appeal of Appellant's co-defendant Barber, we considered and rejected the same statutory argument Appellant makes today.[10] OCGA § 24-14-8 provides:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a

---

[9] Appellant does not challenge his plea in this case.

[10] Appellant makes no argument about the trial court's instruction to the jury on corroboration, so we do not address it. See *Barber*, 314 Ga. at 765 n.4.

second witness, except in prosecutions for treason.

In *Barber v. State*, 314 Ga. 759, 766 (879 SE2d 428) (2022), we affirmed Barber's convictions. On appeal, Barber argued that the evidence was insufficient under OCGA § 24-14-8 because Washington was an accomplice and her testimony was not sufficiently corroborated. See id. at 763. We held that even if Washington was an accomplice, other evidence corroborated Washington's testimony, so we rejected Barber's argument. See id. at 763-765. Appellant's argument here fails for the same reasons. See id.

Moreover, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt as a party to the crimes of which he was convicted, instead of merely being an accessory after the fact. See *Jackson*, 443 U.S. at 319. See also OCGA § 16-2-20 (defining parties to a crime). Phone records showed that Appellant was associated with the other members of the group at the time of the "gang war" and shooting,

including an "OG" member of the Rollin 20s gang who, according to the State's gang expert, was likely controlling the group's movements on the streets. As part of that coordinated gang war, Appellant traveled with the group into known Billy territory to meet a member of their rival gang, provided one of the guns used in Bottoms's shooting, and drove the getaway car. Accordingly, the evidence was constitutionally sufficient. See *Mathews v. State*, 314 Ga. 360, 365 (877 SE2d 188) (2022) (explaining that the evidence can be sufficient as a matter of constitutional due process to support a defendant's felony murder conviction even when the defendant was not the one who fired the fatal shot). See also *Parks v. State*, 304 Ga. 313, 316 (818 SE2d 502) (2018) (holding that the evidence was sufficient to support a felony murder conviction as a party to the crime based on "evidence of [the defendant's] presence at the scene, his companionship with other members of [a gang], and his actions during and after the crimes"); *Thornton v. State*, 292 Ga. 87, 88 (734 SE2d 393) (2012) (holding that the evidence underlying a felony murder conviction was sufficient where, among other things, the

20

defendant drove himself and others to the location where the shooting occurred and drove the getaway car); *Huckabee v. State*, 287 Ga. 728, 728-729 (699 SE2d 531) (2010) (holding that the evidence was sufficient under *Jackson* to support felony murder conviction as a party to the crime where the defendant "never exited the car" but was part of a group that went riding around in a stolen car to rob others).

3. Appellant next contends that the trial court violated his federal due process rights by forcing Appellant to appear before the jury at trial in prison clothing and shackles. Appellant has abandoned his prison-clothing argument on appeal, and any shackling error was harmless beyond a reasonable doubt.[11]

---

[11] Appellant argues only that the leg iron violated federal due process under *Deck v. Missouri*, 544 U.S. 622, 630-632 (125 SCt 2007, 161 LE2d 953) (2005), and its progeny. See *Weldon v. State*, 297 Ga. 537, 543 (775 SE2d 522) (2015) (Nahmias, J., concurring) (identifying various claims to which shackling can give rise). See also *Tavarez*, 319 Ga. at 486 (holding that any claim about "the shackling itself" was not preserved for appellate review but addressing a violation of the defendant's right to be present). We limit our analysis to the specific due process claim that Appellant raises and express no opinion on other constitutional issues that could have been raised. See *Hill v. State*, 308 Ga. 644, 647-648 (842 SE2d 853) (2020) (when considering the harmlessness of a due process shackling violation, focusing only on the type of harm that the

21

Before trial, trial counsel filed a document styled "Notification of Intent to not Wear Street Clothes During Trial" to alert the trial court that "Defendant does not intend to wear and/or change into 'street clothes' during" trial. Moreover, the filing represented that "Defendant specifically waives for purposes of Appeal and/or any other post-Trial proceeding any claim of any type or sort that Defendant did not receive a fair trial based upon any claim that Defendant did not wear and/or change into 'street clothes' during Defendant's Jury Trial." Subsequently, in the courtroom before voir dire, the following occurred outside the presence of the prospective jurors:

> TRIAL COURT: Okay. Good luck. Let's choose the jurors.
> DEPUTY: Are you ready for the jury?
> TRIAL COURT: Yes.
> DEFENSE COUNSEL: And Judge, my client is worried about all of the shackles and —
> DEPUTY: He has on a leg iron. That's what he needs for security.

due process violation created). See also *Deck*, 544 U.S. at 630-632 (reasoning that visible shackling violates due process because it "undermines the presumption of innocence and the related fairness of the factfinding process," "diminishes" the right to counsel by impeding a defendant's ability to participate in his defense, and "affronts the dignity and decorum of judicial proceedings" (cleaned up)).

TRIAL COURT: Mr. Wallace, you're going to have to just chill.

DEPUTY: He doesn't have anything on his arms, Your Honor, he has to have something on, that everybody else does.

APPELLANT: But they are in civilian clothes.

DEPUTY: That's because he refused to put the leg brace on this morning.

APPELLANT: I ain't going —

TRIAL COURT: You are going to have to try to remain calm and, you know, you've selected to wear your prison clothes and I understood you were up until just recently you weren't going to come out of your cell.

APPELLANT: That wasn't true, Your Honor.

TRIAL COURT: That's not true?

APPELLANT: I just — I ain't want the chains on. I wanted the electric. That's all I said.

DEPUTY: Your Honor, I was told by the attorney that he wasn't dressing out. If he was dressing out like the other guys he would have on the same type of security equipment that the other guys have on. He refuses to dress out.

TRIAL COURT: All right. I think we need to stop at [prospective juror] 96. And then send the rest back upstairs.

The trial court made no further ruling about the leg iron during trial.

In its order denying Appellant's motion for new trial, the trial court found that Appellant wore "a leg iron" at trial, citing a deputy's

statement at trial to the trial court.[12] Additionally, the trial court found that the leg iron was not visible to the jury, crediting trial counsel's testimony at the motion for new trial hearing over Appellant's.

(a) Appellant has abandoned on appeal any argument he could have made about prison clothing. Although in the heading of his brief he mentions that Appellant "was unconstitutionally . . . tried wearing prison garb," the substance of his brief focuses on the leg iron only. Accordingly, Appellant has abandoned that argument on appeal pursuant to this Court's former Rule 22.[13] See *Sinkfield v. State*, 318 Ga. 531, 547 n.11 (899 SE2d 103) (2024) (holding that, under former Rule 22, a defendant abandoned purported enumerations of error where he made "no substantive argument" about them).

---

[12] The order did not specify whether Appellant wore a single brace around one of his legs that was attached to some fixed object, such as the defense table, or whether Appellant wore a brace around each of his legs attached to each other with a chain.

[13] Appellant has adequately briefed the prison-clothing argument with respect to ineffective assistance of counsel, so we do address it in Division 4.

(b) "On direct appeal where unconstitutional shackling has occurred, there is a presumption of harm that can be overcome only upon a showing by the State that the shackling was harmless beyond a reasonable doubt." *Hill v. State*, 308 Ga. 638, 647 (842 SE2d 853) (2020) (cleaned up). See also *Deck v. Missouri*, 544 U.S. 622, 635 (125 SCt 2007, 161 LE2d 953) (2005); *Holbrook v. Flynn*, 475 U.S. 560, 568 (106 SCt 1340, 89 LE2d 525) (1986). Assuming without deciding that the placement of Appellant in a leg iron was unconstitutional, the State has carried its burden here to show that any error was harmless beyond a reasonable doubt.

First, the trial court found that the leg iron was not visible to the jury. Compare *Hill*, 308 Ga. at 647-648 (holding that a shackling error was not harmless beyond a reasonable doubt where jurors saw the defendant "in handcuffs, a waist chain, and leg irons throughout [the] trial"). Second, as trial counsel explained at the motion for new trial hearing, Appellant used the leg iron to his advantage at trial in at least two ways. Appellant asserted that the leg iron demonstrated he accepted responsibility for his actions by pleading "guilty to the

25

parts of the indictment that he committed — that he was guilty of," a strategy that was consistent with Appellant's pre-trial decision to wear prison clothes at trial. Moreover, Appellant argued at trial that because he had already pled guilty to other charges, "there [was] no need to give him a conviction on a crime he didn't do just to give him some jail time because you are afraid of him, because you don't want him on the street." In opening argument, for example, trial counsel told the jury, "Don't you notice he's dressed differently than the other guys? Didn't you notice that? Little different dress he's wearing over there and he's in chains. But he's serving time right now. He's in the department of custody [sic] right now." In this way, Appellant turned the prejudice he may have suffered from the leg iron to his own strategic advantage. Cf. *Elmore v. Sinclair*, 799 F3d 1238, 1247-1248 (9th Cir. 2015) (holding, in a federal habeas case, that any shackling error during the sentencing phase of a capital trial did not have a "substantial and injurious effect or influence in determining the jury's verdict," in part because the defendant "agreed to appear before the jury in jail clothing for the entire trial

26

as part of" his defense strategy to "show . . . acceptance of responsibility" (cleaned up)); *United States v. Kalilikane*, 340 Fed. Appx. 404, 405 (9th Cir. 2009) ("Any error resulting from the shackles . . . was harmless," in part "because [the defendant] brought the shackles to the jury's attention[.]").

Third, the State presented strong evidence of Appellant's guilt. The evidence at trial showed that Appellant was a Rollin 20s member who participated in Bottoms's shooting as part of a coordinated retaliation for the shooting of Barber's stepfather and as part of a larger, ongoing gang war. Appellant even provided one of the weapons used in the shooting and helped the group flee the scene. And although the jury heard evidence about Appellant's displeasure with Barber after the shooting, evidence that Appellant became remorseful after someone died did not change anything about the strength of the evidence showing that Appellant proximately caused that death by participating in a gang war. Compare *Hill*, 308 Ga. at 647-648 (holding that a shackling error was not harmless beyond a reasonable doubt where the evidence was

weak), with *United States v. McGill*, 815 F3d 846, 895 (D.C. Cir. 2016) ("The overwhelming weight of evidence against [the defendants] reinforces the harmlessness [beyond a reasonable doubt] of any [shackling] error." (cleaned up)), and *United States v. Brantley*, 342 Fed. Appx. 762, 767-770 (3d Cir. 2009) (shackling error was harmless beyond a reasonable doubt where the defendant "admitted two of the three elements of the crime he was charged with, and he did not contest the third"). Cf. *United States v. Gross*, No. 22-11543, 2024 WL 448368, at *12-15 (11th Cir. Feb. 6, 2024); *Kalilikane*, 340 Fed. Appx. at 405; *Hatten v. Quarterman*, 570 F3d 595, 603-604 (5th Cir. 2009); *Lakin v. Stine*, 431 F3d 959, 966 (6th Cir. 2005). Fourth, the trial court instructed the jury on the presumption of innocence, the burden of proof, that convicting one defendant did not require convicting another or all defendants, and that it should only concern itself with the guilt or innocence of a defendant. These instructions steered the jury away from deciding Appellant's guilt based on the leg iron. And we presume that these qualified jurors followed the trial court's instructions. See *Womac v.*

28

*State*, 302 Ga. 681, 683 (808 SE2d 709) (2017). On these unique facts, we conclude that the State has carried its burden to show that any assumed error was harmless beyond a reasonable doubt.[14]

Notwithstanding this, we urge trial courts not to mistake our ruling today as an endorsement of shackling criminal defendants as a routine matter. We are gravely concerned by the possibility of such a practice among Georgia trial courts and reiterate that "no person should be tried while shackled *except as a last resort.*" *Hill*, 308 Ga. at 644 (cleaned up; emphasis supplied) (reversing conviction due to unconstitutional shackling). See also *Deck*, 544 U.S. at 629 (explaining that due process "prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial"); *Tavarez v. State*, 319 Ga. 480, 489 (904 SE2d 366) (2024) (LaGrua, J., concurring) ("Case law

---

[14] Nothing in the record indicates that the leg iron prevented Appellant from participating in his own defense by, for example, communicating with trial counsel or testifying about his own version of events. See *Deck*, 544 U.S. at 630-632.

makes clear that shackling should not be a general policy[.]" (cleaned up)). We simply hold today — in this unique circumstance — that any assumed error was harmless beyond a reasonable doubt. See *Brantley*, 342 Fed. Appx. at 770 ("Although [the defendant] is not entitled to relief, no court should take imposing restraints lightly or cavalierly.").

4. Appellant claims that he was deprived of the effective assistance of counsel. To prevail on this claim, Appellant must show that trial counsel was professionally deficient and that this deficiency prejudiced Appellant. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "To show deficient performance, [a] defendant must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms." *Tavarez*, 319 Ga. at 484 (cleaned up). Additionally, "to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been

different." Id. (cleaned up). We need not address both deficiency and prejudice if a defendant fails to establish one of them. See id.

(a) Appellant asserts that his trial counsel was ineffective in two ways. He points first to trial counsel's failure to generally demur to the felony murder count of the indictment after jeopardy attached. According to Appellant, the State indicted him in a "circular" manner such that the felony murder count was subject to a general demurrer, because it alleged that he committed felony murder predicated on participation in criminal street gang activity and that, in turn, he committed participation in criminal street gang activity by committing felony murder. Even if the way that Appellant characterizes the indictment is correct, his ineffective assistance claim fails because a general demurrer to the felony murder count would have been meritless.

"An indictment is subject to a general demurrer if the accused could admit each and every fact alleged in the indictment and still be innocent of any crime." *Clark v. State*, 315 Ga. 423, 443 (883 SE2d 317) (2023) (cleaned up). By contrast, a general demurrer fails if "the

31

admission of the facts alleged in the indictment leads to the conclusion that the defendant is guilty of the charged crime." Id. Here, the indictment alleged that Appellant committed felony murder when he "did unlawfully during the commission of a felony, to wit: Participation in Criminal Street Gang Activity, cause the death of Darius Tyriq Bottoms, a human being, by shooting him with a handgun." This language followed OCGA § 16-5-1 (c), which provides, "A person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." The felony murder count could withstand a general demurrer because Appellant could not have admitted that he caused Bottoms's death while committing participation in criminal street gang activity, a felony, and been innocent. See *Clark*, 315 Ga. at 442-443; *Stinson v. State*, 279 Ga. 177, 179 (611 SE2d 52) (2005); *Lowe v. State*, 276 Ga. 538, 539-540 (579 SE2d 728) (2003). Because a general demurrer would have been meritless, Appellant has failed to demonstrate that trial counsel performed deficiently. See *Clark*, 315 Ga. at 442-443.

(b) Appellant also contends that trial counsel was ineffective because he strategically placed Appellant in a leg iron and prison clothing at trial without seeking a no-adverse-inference jury instruction. Appellant acknowledges that trial counsel's choice was a strategic one, but he argues that no reasonable attorney would have followed that strategy. See *Anderson v. State*, 319 Ga. 56, 63 (901 SE2d 543) (2024) ("Decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." (cleaned up)). We need not decide whether trial counsel performed deficiently because Appellant has failed to demonstrate *Strickland* prejudice. As we explained above, the evidence against Appellant was strong, and the trial court's jury instructions reinforced to the jury that it should decide Appellant's guilt or innocence based on that evidence, not the leg iron or prison clothing. Accordingly, Appellant has failed to demonstrate a reasonable probability that the outcome of his trial would have been different had trial counsel not pursued this strategy. See *Funck v.*

*State*, 296 Ga. 371, 376 (768 SE2d 468) (2015); *Whatley v. Terry*, 284

Ga. 555, 571 (668 SE2d 651) (2008).[15]

*Judgment affirmed. All the Justices concur.*

---

[15] Appellant makes no argument that we should apply a cumulative-error review. See *State v. Lane*, 308 Ga. 10, 18 (838 SE2d 808) (2020) (specifying that "a defendant who wishes to take advantage of the [cumulative-error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors"). Nevertheless, even assuming that we must sua sponte apply cumulative-error analysis under *Lane*, we conclude that Appellant has failed to establish that the combined prejudicial effect of the one assumed error by the trial court and the one assumed instance of deficient performance of trial counsel denied him a fundamentally fair trial. See, e.g., *Huff v. State*, 315 Ga. 558, 567-568 (883 SE2d 773) (2023) (rejecting cumulative-error claim "because Appellant has not demonstrated that the prejudicial effect of the assumed trial court errors and ineffective assistance denied him a fundamentally fair trial").

LAGRUA, Justice, concurring.

In an era of increasing violence—pervasive in our communities, our schools, and even our courts—it is easy to understand the desire and necessity to ensure the safety of jurors, witnesses, spectators, and court personnel inside the courtroom during court proceedings. That said, adherence to the law and the presumption of innocence remain paramount. We cannot nor should not place unreasonable restraints on criminal defendants, which is why I join fully in the Majority Opinion, but write to caution trial courts.

Security of the courtroom is in the discretion of the trial court and cannot be abdicated to law enforcement personnel. See *Green v. State*, 246 Ga. 598, 600 (6) (272 SE2d 475) (1980). While consultation with law enforcement personnel is advisable, see id., the ultimate decision must be that of the trial court, guided by the law. See *Weldon v. State*, 297 Ga. 537, 540-541 (775 SE2d 522) (2015) (holding that it is "well established that the use of

extraordinary security measures to prevent dangerous or disruptive behavior which threatens the conduct of a fair and safe trial is within the discretion of the trial court") (citation and punctuation omitted).

In this case, the deputy's only basis for restraining and utilizing different security measures for Mr. Wallace from the other defendants was that Mr. Wallace elected to wear his jail uniform at trial, as opposed to street clothes. And the trial court made no findings regarding the appropriateness of the deputy's decision or the restraining of Mr. Wallace.

"It is well established that no person should be tried while shackled except as a last resort[,]" and, should a trial court utilize shackles, the trial court must make "case-specific and individualized findings to support its initial decision. . . ." *Hill v. State*, 308 Ga. 638, 644-645 (2) (a) (842 SE2d 853) (2020) (citation and punctuation omitted). Case law makes clear that merely charging a defendant, who is presumed to be innocent, with a violent offense is not — in and of itself — sufficient to justify such

36

restraint. And, if a trial court nonetheless decides to shackle a defendant, "the record must provide a basis for [its security] determinations," id. at 644 (2) (a), and additional, enhanced security measures.

I am authorized to state that Presiding Justice Peterson, Justice McMillian, and Justice Pinson join in this concurrence.